# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### November 3, 2010 Session

## STATE OF TENNESSEE v. JEREMY GARRETT

**Direct Appeal from the Court of Criminal Appeals**

**Criminal Court for Shelby County**
**No. 04-07755, 04-05871     W. Otis Higgs, Judge**

_____

**No. W2007-02700-SC-R11-CD - Filed January 24, 2011**

─────────────────────

The defendant was indicted separately for two different criminal episodes, one involving an aggravated robbery and the other involving a homicide and an especially aggravated robbery. On the State's motion but over the defendant's objection, and without conducting an evidentiary hearing, the trial court consolidated the indictments for a single trial. The jury convicted the defendant of all offenses charged, and the Court of Criminal Appeals affirmed. On appeal, the defendant contends that the trial court committed reversible error in consolidating the offenses. We hold that the trial court erred both as to methodology and as to result in consolidating the indictments. When a defendant objects to the State's pretrial motion to consolidate offenses, the trial court must conduct a hearing and consider the motion under the severance provisions of Tennessee Rule of Criminal Procedure 14(b)(1), not the provisions of Rule 8(b). We also hold that a prosecutor should refrain from seeking the consolidation of offenses over a defendant's objection unless the prosecutor has a good faith basis for arguing that the requirements of Rule 14(b)(1) will be met. The trial court's error in ordering consolidation requires that we reverse the defendant's conviction of aggravated robbery and remand for a new trial on that charge. The trial court's error was harmless as to the defendant's convictions for first degree felony murder and especially aggravated robbery, and we affirm those convictions.

**Tenn. R. App. P. 11; Judgment of the**
**Court of Criminal Appeals Affirmed in Part,**
**Reversed in Part; Remanded**

CORNELIA A. CLARK, C. J., delivered the opinion of the Court, in which JANICE M. HOLDER, GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

James E. Thomas (on appeal), Memphis, Tennessee, and Tyrone Paylor and Robin Steward (at trial), Memphis, Tennessee, for the appellant, Jeremy Garrett.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Asst. Attorney General; William L. Gibbons, District Attorney General; James Wax and Paul Hagerman, Asst. District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

During its July 2004 term, the Shelby County grand jury indicted the appellant, Jeremy Garrett ("Defendant"), for the aggravated robbery of Mexwayne Williams committed on March 28, 2004. During its September 2004 term, the Shelby County grand jury indicted Defendant for the first degree felony murder and the especially aggravated robbery of Dexter Birge committed on March 29, 2004. On January 9, 2006, the State filed a motion to consolidate the indictments "on the grounds that the offenses charged constitute parts of a common scheme or plan and/or the offenses charged are of the same or similar character." On November 15, 2006, Defendant filed a response to the State's motion, objecting that consolidation was not proper. Without holding an evidentiary hearing, the trial court entered an order on January 24, 2007, granting the State's motion on the basis that "the offenses charged in the captioned indictments constitute parts of a common scheme or plan and/or the offenses charged are of the same or similar character." Trial before a jury was held beginning August 6, 2007, on all three offenses charged.[1] We summarize the proof of each case by victim and in chronological order.

### Aggravated Robbery of Mexwayne Williams

Mexwayne Williams testified that, on the afternoon of March 28, 2004, he drove to a tobacco store in Shelby County to purchase some cigarettes. The cashier requested identification, so he returned to his car to retrieve it. As he approached his car, two men accosted him. One of the men put a gun to his chest and told him to sit on the ground. The other man took his car keys. The man with the gun got in the driver's side of Williams's car while the other man got in the passenger side. The two men then drove off in Williams's car.

Williams returned to the store and called the police to report a carjacking. In conjunction with the ensuing investigation, he viewed two photographic arrays of six individuals each and identified both of his attackers, one from each array. On direct examination, Williams stated that he was "pretty sure about one of them," but was unable to identify Defendant in the courtroom as one of his attackers. He explained that he had never seen the men before the carjacking and that he had been frightened during the event.

---

[1] Although Defendant was indicted with one codefendant on the March 28, 2004 offense and with two codefendants on the March 29, 2004 offenses, he was tried individually.

2

On questioning, Williams described the man who had held the gun on him as "about six feet, between the ages of like eighteen and twenty-five, dark skinned." The man was wearing dark clothes and had a "gray skull cap" on his head. Williams described the other man as "bright skinned," about five feet nine or ten inches tall, about the same age, and wearing a white hoodie. He was certain about his identification of the dark-skinned man but less certain about his identification of the other man, and he stated that he had focused more on the dark-skinned individual during the incident.

Williams recovered his car several days later. The wheels, tires, and dashboard CD player were missing. He identified photographs of his car and described it as a 1997 or 1998 Grand Marquis. The photos in the record reveal that the car is black in color.

Codefendant Tommy Turley testified and identified Defendant as the subject of the photograph that Williams had selected from the first photo array.[2] He identified himself as the subject of the photograph that Williams had selected from the second photo array. Turley also identified the photographs of the vehicle taken from Williams, which were previously admitted into evidence. Turley further testified that, on March 28, 2004, he and Kelly Richardson were riding with Defendant in Defendant's car when he saw Williams's car pull up to the tobacco store. He noticed the wheel rims on the car, and he told Defendant to pull over. Defendant did so and, when Williams came out of the store, Turley approached him, held his gun to Williams, and told Williams to give him the car keys. Williams gave Turley the keys and Turley gave the keys to Richardson. Richardson got in the driver's seat of Williams's car and Turley got in the passenger seat. Richardson drove the car to Defendant's uncle's house by following Defendant, who continued to drive his own car. When asked what Defendant did during the confrontation with Williams, Turley said "[n]othing." He also testified, however, that Defendant was "aware" and "knew" that Turley was going to rob Williams.

Turley testified that, once they arrived at Defendant's uncle's house, Turley removed the rims from Williams's car. He put the rims in Defendant's car and the three men (including Richardson) went to East Memphis where Turley sold the rims for cash. The three men split the proceeds.

On cross-examination, Turley reiterated that he "robbed" Williams. He also identified his gun as a "BB gun."

Also admitted into evidence were Turley's two statements to the police, obtained on April 1 and 3, 2004. As to the robbery of Williams, Turley told the police that he had

---

[2] This is the suspect that Williams described as "bright skinned." Williams was less certain about his identification of this suspect.

3

accosted Williams with a gun and demanded his car keys. Turley said that the gun was a BB gun but looked "like a real gun." According to Turley's statement, after Turley got the keys, Defendant got into Williams's car and drove because Turley did not know how to drive. The two men left behind the car in which they had arrived. Defendant drove Williams's car to Defendant's uncle's house, where they removed the wheel rims. Defendant's uncle was not home at the time. Defendant gave Turley $300 after selling the rims. Turley also told the police that Defendant "ain't got no gun." Turley's statement makes no mention of Richardson's involvement in the crime against Williams.

When questioned about the inconsistencies between his trial testimony and his earlier statements,[3] Turley maintained that he had been high on cocaine while making his statements. He testified that he was telling the truth at trial, and he reiterated that Defendant had remained in his car during the Williams robbery and that Turley had the gun during that offense.

Jeremy Waller, Defendant's uncle, testified that Defendant and two other men came to his home on Sunday, March 28, 2004. Defendant and a man Waller did not know arrived in one car. Another man, whom Waller referred to as "Twin," arrived in a black car, pulling in behind Waller as he returned from church.[4] Waller stated that the men took the wheels off of the black car to sell and left with the rims. The men did not return that day. Waller identified a photograph of Williams's car.

<u>First Degree Felony Murder and
Especially Aggravated Robbery of Dexter Birge</u>

Willie Johnson testified that he went to the Dollar General Store on Shelby Drive in Memphis on March 29, 2004. When he opened the door to enter the store, another man exited the store. This man went to his car, where he (the man who had just exited the store) was grabbed by another man. The two men began wrestling, and Johnson saw something drop, which he thought was a gun. Johnson told the store clerks about the fight, and they all watched. The two fighting men were on the ground when a third man "came from the side of the building, just walked up to the guy and shot him in the head."

---

[3] Generally, a jury's consideration of extrinsic proof of a prior inconsistent statement is limited to its impact on the witness's credibility. <u>See</u> Tenn. R. Evid. 613(b); <u>State v. Smith</u>, 24 S.W.3d 274, 279 (Tenn. 2000); Neil P. Cohen et al., <u>Tennessee Law of Evidence</u>, § 613[2][b] (5th ed. 2005). However, "if no objection is made to a prior inconsistent statement as substantive evidence, the evidence may be used by the jury for that purpose." Cohen, <u>Tennessee Law of Evidence</u> at § 613[2][b]; <u>see also</u> <u>Smith</u>, 24 S.W.3d at 280-81. In this case, the defense did not object to the admission of Turley's two statements to the police.

[4] At the top of Turley's April 1 statement is printed the explanation that Turley "also goes by the name Twin."

4

Johnson stated that he and the other people in the store who were watching ran to the back of the store. A few minutes later, the man who had been shot entered. Someone called 911. Johnson had never seen either the victim or his two attackers before and was unable to identify the man who shot the victim.[5]

On cross-examination, Johnson acknowledged that he did not actually see the gun with which the victim was shot and assumed that the third person was the one who shot it. He heard only one gunshot. On redirect, Johnson explained that the victim was on the ground fighting with the second individual when the third man came up and, while standing, pointed his arm at the victim.

Robert E. Birge testified that he was the deceased victim's father. He identified a photograph of the Yukon SUV that his son was driving on the day he was killed.

Detective Jeff McCall of the Shelby County Sheriff's Office responded to the shooting call at the Dollar General Store. He found the victim lying on the floor in the store; an ambulance was on the way. Detective McCall described the time of day as dusk.

Turley, also a codefendant on the charges involving Dexter Birge, testified that, on March 29, 2004, he and Defendant were riding around with Corey Richmond, who was driving. They were looking for more rims. They saw Birge's vehicle and followed it to a store. While Birge was in the store, Turley and Defendant got out of Richmond's car, and Richmond left. When Birge came out of the store, Turley approached him, pulled his gun, and told Birge "this is a stickup let me get them keys." Turley testified about what happened next:

> [Birge] swung or something. He started tussling and fighting. He fell to the ground. I picked the keys up and ran to the passenger side and threw [Defendant] the keys. I heard a shot. And I went back around there. He [the victim] was running back in the store. We panicked and jumped in the truck and left.

Turley testified that he hit Birge with his gun during their altercation. He also testified that he got in the passenger side of Birge's truck because he did not know how to drive. Turley identified photographs of the vehicle taken from Birge.

Turley testified that Defendant had a gun but he did not remember what kind. Defendant drove Birge's vehicle to Waller's house. On the way, Turley threw his gun out

---

[5] The victim subsequently died.

the window. Turley did not know what Defendant did with his gun. When they arrived at Waller's house, Richmond was already there.

At Waller's house, Turley removed one of the wheel rims from Birge's vehicle. He put the rim in Richmond's car and Richmond drove Turley and Defendant to East Memphis to try and find a buyer for the rims.

Waller testified that he again saw Defendant at his house on March 29, 2004. Defendant was with "Twin" and another man named Corey. They were in a vehicle Waller had not seen before; he did not know who drove it there. Waller "didn't feel right" about what was going on and told the men to get both the black car and the new vehicle "away from there." When Waller checked back, there was a wheel missing from the new vehicle and the men were gone.

The police arrived later that day and questioned Waller about the two vehicles. Waller "told them what [he] knew." He told the police he did not know who had been driving them, that they were not his, and he had not seen them before they came to be there.

Dr. Karen Chancellor, the chief medical examiner for Shelby County, testified that she did not perform the autopsy on Dexter Birge but had reviewed the autopsy records. The cause of Birge's death was a gunshot wound to the chest. The bullet, recovered from Birge's body, first pierced Birge's left arm and then entered his torso where it struck his left lung, his heart, his liver, and his stomach. Dr. Chancellor estimated that the gun barrel was "a few inches away from Mr. Birge's body when it was fired." Birge had also suffered some abrasions and lacerations to his face, chest and back. The wounds to Birge's face were consistent with his being struck with a blunt object.

Sergeant Vernon Dollahite, Jr. of the Shelby County Sheriff's Office testified that he was involved in the investigation of Birge's homicide and interviewed Defendant on April 4, 2004. The audiotape of that interview was played for the jury, and this Court has listened to it. During his interview, Defendant stated that he and Twin were walking down the street at around 4:00 or 5:00 in the afternoon. They saw Birge drive by, and Twin decided to rob him. While Twin was hitting Birge with his pistol, Defendant ran over to back him up. According to Defendant, Twin shot Birge; Defendant said that he never touched him. Defendant stated that he went into a "state of shock." Twin threw Birge's car keys at him, and Defendant got into the driver's seat because Twin could not drive. Twin tried unsuccessfully to get into the passenger side, and then ran around and climbed in over Defendant. Defendant drove them to Waller's house. A short time after they arrived there, Corey Richmond and Waller pulled up in separate cars at about the same time. Waller told the men to get their "hot s**t off [his] land." Defendant gave one of the rims from Birge's SUV to Defendant's cousin.

6

Defendant stated that he knew Twin had a gun and described it as a .22 or .25; he did not know what Twin had done with the pistol after the shooting. Defendant also admitted that he had had a .380 gun in case of "emergency," but said that he "got rid of it" after Twin shot Birge. Defendant also stated that he burned the clothes he had been wearing during the offense.

Corey Richmond, also charged with the crimes against Dexter Birge, testified that, on March 29, 2004, he, Turley, and Defendant were driving around together. Richmond was driving, Defendant was in the front passenger seat, and Turley was in the backseat. Turley asked Defendant if Richmond would "help him." Richmond asked Defendant

> what was he talking about. And [Defendant] told me that they was fixing to get some money. They was going to get some rims. And — and I told them that I wasn't really – I really didn't get down like that but that I would drop them off when they saw whoever they needed to see.

As Richmond was about to stop and get some gas, Turley told him to follow an SUV "with large rims on it" that Turley had seen. Richmond followed the SUV to the Dollar General Store. Richmond said that the SUV parked in the front and he parked "on the side." As he parked, he got a phone call. While he was conversing on the phone, Defendant and Turley got out of the car. After a minute or two, Richmond heard a gunshot and ended his phone call. He saw several vehicles leaving the parking lot, including the SUV. In the SUV were Defendant and Turley. Richmond also left and went to the gas station. He later met Defendant and Turley at Waller's house, where he saw the SUV. Defendant and Turley removed one of the rims from the SUV and put it in Richmond's car. The three men then left.

Richmond testified that he did not see the shooting. He later heard Defendant and Turley discussing it, however, and testified that Turley "asked [Defendant] why did he shoot him. And [Defendant] told him, well, he was whupping you. I had to help you out. I had to get him up off you."

On cross-examination, Richmond admitted to having previously given a statement to the police that was "completely different" from his trial testimony. In his earlier statement, he claimed to have been elsewhere with his girlfriend at the time of the crime. He testified that he told the police a story because they refused to let him speak with his lawyer. He acknowledged that his fingerprints were in the SUV because he had opened the door and looked at some CDs that he found inside. He also stated that he had tried to wipe his fingerprints off because he realized "once I dropped them off at the Dollar Store that I shouldn't have had any part of it."

7

Richmond stated that he was hoping for "some leniency" in exchange for his testimony.

The State rested after Richmond's testimony. The defense proffered no proof. The jury convicted Defendant of all offenses charged.[6] In his motion for new trial, Defendant alleged that the trial court "erred by Granting the State's Motion to Consolidate the Indictments without conducting an evidentiary hearing as requested by the Defendant pursuant to the Rules of Criminal Procedure" and that the trial court "erred by Granting the State's Motion to Consolidate the Indictments without providing specific written or oral findings to support the Court's decision to grant the State's motion as requested by the Defendant pursuant to the Rules of Criminal Procedure and established case law." At the hearing on Defendant's motion for new trial, the trial judge acknowledged that "we didn't grant an evidentiary hearing" but stated that he had asked the prosecutor "to give [the trial court] a statement about these matters, the facts, and otherwise as to why [the State was] consolidating these cases." The court stated that it "was satisfied with what . . . the record reflects, relative to the consolidation." As to Defendant's assertion that the trial court erred by not making specific findings in support of its grant of the State's motion to consolidate, the trial court stated simply that it "thought the State's intentions and, in addition, the State's statement was adequate for the Court to grant the consolidation." However, the record on appeal contains no "statements" by the prosecution concerning its motion to consolidate other than the assertions in the written motion.

On appeal, the Court of Criminal Appeals held that the trial court erred in consolidating the indictments, but determined that the error was harmless. The intermediate appellate court therefore affirmed Defendant's convictions.

**STANDARD OF REVIEW**

This Court reviews a trial court's decision to consolidate offenses for abuse of discretion. Spicer v. State, 12 S.W.3d 438, 442 (Tenn. 2000). A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party. State v. Jordan, 325 S.W.3d 1, 39 (Tenn. 2010). This Court will also find an abuse of discretion when the trial court has failed to consider the relevant factors provided by higher courts as guidance for determining an issue. State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007).

---

[6] The trial court subsequently sentenced Defendant to eight years of incarceration for the aggravated robbery; fifteen years of incarceration for the especially aggravated robbery; and life imprisonment for the murder, all to run concurrently. Defendant has not appealed his sentences.

## ANALYSIS

### *Consolidation of Offenses*

Tennessee Rule of Criminal Procedure 13(a) provides that a trial court "may order consolidation for trial of two or more indictments, presentments, or informations if the offenses and all defendants could have been joined in a single indictment, presentment, or information pursuant to Rule 8." Tenn. R. Crim. P. 13(a). Tennessee Rule of Criminal Procedure 8, in turn, provides that offenses may be consolidated "if: (1) the offenses constitute parts of a common scheme or plan; or (2) they are of the same or similar character." Tenn. R. Crim. P. 8(b). However, a defendant may obtain *as of right* the severance of offenses that have been consolidated "unless the offenses are part of a common scheme or plan *and* the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1) (emphasis added).

This Court has considered the interplay of Rules 8, 13, and 14 numerous times in recent years. See, e.g., State v. Dotson, 254 S.W.3d 378, 386-90 (Tenn. 2008); State v. Denton, 149 S.W.3d 1, 12-15 (Tenn. 2004); State v. Goodwin, 143 S.W.3d 771, 779-81 (Tenn. 2004); State v. Toliver, 117 S.W.3d 216, 226-30 (Tenn. 2003); Spicer, 12 S.W.3d at 443-47; State v. Moore, 6 S.W.3d 235, 238-42 (Tenn. 1999) (analyzing defendant's motion to sever one count from a multiple-count indictment); State v. Shirley, 6 S.W.3d 243, 247-50 (Tenn. 1999). Notwithstanding these frequent discussions and repeated instructions, some trial courts and prosecutors continue to struggle with the proper application of these rules in various factual contexts. We therefore take this opportunity to emphasize, once again, the proper procedure.

Where the State initially seeks to consolidate separate indictments, it must establish only one thing: that the offenses are *either* (1) "parts of a common scheme or plan," *or* (2) that the offenses are "of the same or similar character." Tenn. R. Crim. P. 8(b). See also Spicer, 12 S.W.3d at 443. If the defendant objects to the consolidation of offenses that would otherwise be permissible under Rule 8(b), however, the offenses may *not* be tried together unless *two* criteria are met: (1) "the offenses are parts of a common scheme or plan *and*" (2) "the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1) (emphasis added). See also Denton, 149 S.W.3d at 12-13. "Consequently, when a defendant objects to a pre-trial consolidation motion by the [S]tate, the trial court must consider the motion by the severance provisions of Rule 14(b)(1), not the . . . [provisions] of Rule 8(b)." Spicer, 12 S.W.3d at 443. Therefore, where a defendant seeks to prevent the consolidation of offenses,

> the "primary issue" to be considered . . . is whether evidence of one offense
> would be admissible in the trial of the other[s] if the . . . offenses remained

9

severed. See State v. Burchfield, 664 S.W.2d 284, 286 (Tenn. 1984). In its most basic sense, therefore, any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is "really a question of evidentiary relevance." State v. Moore, 6 S.W.3d 235, 239 (Tenn. 1999); see also Shirley, 6 S.W.3d at 248.

Spicer, 12 S.W.3d at 445.

As we have pointed out previously, Tennessee Rule of Evidence 404(b) is called into play when a trial court must decide whether proof of a defendant's alleged misconduct on one occasion may be admitted in conjunction with proving his alleged misconduct on a separate occasion. See Dotson, 254 S.W.3d at 387. Rule of Evidence 404(b) provides categorically that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b).[7] And, we have recognized that the rationale behind this general rule of inadmissibility is that the

> admission of other wrongs carries with it the inherent risk of the jury convicting a defendant of a crime based upon his or her bad character or propensity to commit a crime, rather than the strength of the proof of guilt on the specific charge. When the defendant's [other] bad acts are similar to the crime for which the defendant is on trial, the risk of unfair prejudice is even higher.

Dotson, 254 S.W.3d 387; see also State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994) (recognizing that proof of similar crimes "easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial"). Accordingly, any doubt about the propriety of the consolidation of similar offenses over a defendant's objection should be resolved in favor of the defendant.

If the State seeks the consolidation of offenses under Rule 13(a) and the defendant objects, "the prosecution bears the burden of producing evidence to establish that consolidation is proper." Toliver, 117 S.W.3d at 228 (citing Spicer, 12 S.W.3d at 447). And, the trial court *must* hold a hearing in order to gather the information necessary to adjudicate the issue:

---

[7] Evidence of other bad acts may be admissible, however, to prove, e.g., identity or intent, or to rebut accident or mistake. Tenn. R. Evid. 404 advisory comm'n cmts.

Before consolidation is proper, the trial court must conclude from the evidence and arguments presented at the hearing that: (1) the multiple offenses constitute parts of a common scheme or plan, Tenn. R. Crim. P. 14(b)(1); (2) evidence of [one] offense is relevant to some material issue in the trial of all the other offenses, Tenn. R. Evid. 404(b)(2); Moore, 6 S.W.3d at 239; and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant, Tenn. R. Evid. 404(b)(3).

Spicer, 12 S.W.3d at 445 (as clarified by Dotson, 254 S.W.3d at 386 n.5). See also Dotson, 254 S.W.3d at 387 (recognizing that the procedure a trial court must follow upon a defendant's request that offenses be severed is "well established" and includes the requirement of an evidentiary hearing). Given the analysis that a trial court must undertake in order to determine whether separate offenses may be consolidated for trial over the defendant's objection, the necessity of a hearing is obvious. Moreover, by holding a hearing and issuing findings of fact and conclusions of law, a trial court ensures that, on review, the appellate courts will have an adequate record from which to determine whether the trial court erred upon an allegation that it improperly consolidated offenses. See Spicer, 12 S.W.3d at 445. Accordingly, we emphasize both the need for a hearing and the equally important requirement that the trial court support its ensuing ruling with findings of fact and conclusions of law. See id.

The trial court is not alone in its obligation to analyze properly a dispute over the consolidation of offenses. The State has an independent obligation to determine the propriety of requesting consolidation before asking the trial court to do so. Certainly, the State may seek consolidation as a means of conserving resources and maximizing judicial efficiency; moreover, the State may determine that the defendant will accede to consolidation. However, if the State has reason to believe that the defendant will object to the consolidation of offenses, then it becomes incumbent upon the prosecution to analyze carefully the strength of its position and not to proceed unless it has reasonable grounds for doing so.[8] If the State persists in seeking consolidation, it should request a hearing on the matter in the event the trial court fails to set one.

_____

[8] While we neither hold nor imply that the prosecutors in this case violated any of their ethical obligations, we point out that, under the amended Tennessee Rules of Professional Conduct effective January 1, 2011, prosecutors "shall not knowingly . . . make a false statement of fact or law to a tribunal" or "fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the [prosecutor] to be directly adverse to the position of the client and not disclosed by opposing counsel"; shall not "knowingly disobey an obligation under the rules of a tribunal"; and are subject to discipline for "engag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation[.]" Tenn. Sup. Ct. R. 8, RPC 3.3(a)(1) & (2); 3.4(c); and 8.4(c).

In this case, the trial court failed to hold a hearing on the State's motion to consolidate offenses although Defendant objected to the State's motion and requested that it be denied. The trial court further failed to issue findings of fact and conclusions of law in support of its ruling in the State's favor. Finally, the grounds upon which the trial court granted consolidation are legally insufficient. As set forth above, the trial court's order consolidated the offenses on the basis that they "constitute parts of a common scheme or plan and/or the offenses charged are of the same or similar character." While these grounds are sufficient where the defendant does not resist consolidation, they are wholly inadequate where the defendant does. We repeat: "when a defendant objects to a pre-trial consolidation motion by the state, the trial court *must* consider the motion by the severance provisions of Rule 14(b)(1), *not* the . . . [provisions] of Rule 8(b)." Spicer, 12 S.W.3d at 443 (emphases added). In this case, the trial court erred in its failure to utilize the proper procedure and analysis.

This is not to say that the offenses could not have been consolidated, however. In order to make that determination, we must conduct the analysis that the trial court failed to conduct. Moreover, because the trial court did not hold the required hearing, we must conduct this analysis on the basis of the evidence adduced at Defendant's trial instead of only the evidence adduced at the hearing. See Toliver, 117 S.W.3d at 228 n.4; State v. Prentice, 113 S.W.3d 326, 331-32 (Tenn. Crim. App. 2001) (where record contained neither trial court's order consolidating offenses nor transcript of any hearing, appellate court will review evidence adduced at trial); cf. Spicer, 12 S.W.3d at 445 (providing that, "because the trial court's decision of whether to consolidate offenses is determined from the evidence presented at the hearing, appellate courts should usually only look to that evidence, along with the trial court's findings of fact and conclusions of law, to determine whether the trial court abused its discretion by improperly joining the offenses").

As set forth above, consolidation of Defendant's offenses was proper only if three prerequisites were satisfied: (1) the offenses were all parts of a common scheme or plan; (2) evidence of one offense would be admissible as to some material issue in the trial of the other offenses; and (3) the probative value of the proof of the other offense is not outweighed by its prejudicial effect on the defendant. Thus, we first consider whether the offense committed against Mexwayne Williams and the offenses committed against Dexter Birge were all "parts of a common scheme or plan."

This Court has observed that "there are three types of common scheme or plan evidence: (1) offenses that reveal a distinctive design or are so similar as to constitute 'signature' crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction." Shirley, 6 S.W.3d at 248 (citing Neil P. Cohen et al., Tennessee Law of Evidence § 404.11, at 180 (3d ed. 1995)). As to "signature" crimes, we have described such offenses as involving a modus operandi so unique and distinctive, and involving "such unusual particularities," that reasonable persons

12

would conclude that the means of committing the crimes "would not likely be employed by different persons." Moore, 6 S.W.3d at 240 (quoting Harris v. State, 227 S.W.2d 8, 11 (Tenn. 1950)). In this case, the record does not support the conclusion that the offenses involving Williams and Birge were "signature" crimes, nor does the State contend that it does.

There is also no proof that the offenses involving Williams and Birge were part of a larger plan or conspiracy, and, again, the State does not contend that they were. The record is also clear, and the State does not argue otherwise, that the offenses were not part of the same criminal transaction. In sum, the record fails to satisfy even the first prerequisite for consolidation in the face of Defendant's objection, and the State properly concedes that the consolidation of Defendant's offenses was error.

*Effect of Error*

We review a trial court's erroneous consolidation of offenses for harmless error. Spicer, 12 S.W.3d at 447. That is, we must determine whether the trial court's error "more probably than not affected the judgment." Toliver, 117 S.W.3d at 231 (citing Tenn. R. App. P. 36(b)). In making this determination, we consider the whole record and focus on the "impact the error may reasonably be taken to have had on the jury's decision-making." State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008). "Where an error more probably than not had a substantial and injurious impact on the jury's decision-making, it is not harmless." Id. It is the defendant's burden to demonstrate that the error probably affected the judgment, rendering reversal appropriate. Denton, 149 S.W.3d at 15 (quoting Moore, 6 S.W.3d at 242).

In this regard, "'the line between harmless and prejudicial error is in direct proportion to the degree . . . by which [the] proof exceeds the standard required to convict . . . .'" Spicer, 12 S.W.3d at 447 (quoting Delk v. State, 590 S.W.2d 435, 442 (Tenn. 1979)). "'The more the proof exceeds that which is necessary to support a finding of guilt beyond a reasonable doubt, the less likely it becomes that an error affirmatively affected the outcome of the trial on its merits.'" Toliver, 117 S.W.3d at 231 (quoting State v. Gilliland, 22 S.W.3d 266, 274 (Tenn. 2000)). Nevertheless, we must remain focused not simply on the weight of the evidence, but on "the actual basis for the jury's verdict." Rodriguez, 254 S.W.3d at 372. We turn, then, to the matters before the jury regarding each of the three crimes for which it convicted Defendant.

Aggravated Robbery of Mexwayne Williams

We first examine the proof in support of Defendant's conviction of aggravated robbery involving the victim Mexwayne Williams. The elements of aggravated robbery are

(1) "the intentional or knowing theft of property from the person of another" (2) "by violence or putting the person in fear" which is (3) accomplished with a deadly weapon or by the display of an item used or fashioned to lead the victim reasonably to believe the item to be a deadly weapon. Tenn. Code Ann. § 39-13-401(a) & -402(a)(1) (2003). Our summary of the evidence makes clear that sufficient proof supports the jury's determination that Williams was the victim of an aggravated robbery. The evidence of Defendant's identity as one of the perpetrators is much weaker, however.

Although Williams had picked out a photograph of Defendant from an array, he testified that he was not certain of his identification. And, he was unable to identify Defendant at trial as one of his two assailants. Only Turley definitively placed Defendant at the scene of the crime. Turley testified that Defendant sat in a car while Turley and Richardson committed the offense. According to Turley's testimony, Defendant did "nothing" during the attack on Williams, and Defendant's participation was limited to pulling over at Turley's direction when Turley spotted the rims on Williams's car.[9] Turley's testimony that Defendant drove to Waller's house in the car he remained in during the robbery, and that Turley and Richardson followed him in Williams's vehicle, was corroborated by Waller's testimony that he saw the three men and the two vehicles at his house, and that Defendant was not driving Williams's car but was driving a separate vehicle. Also, Defendant told the police that he was already at Waller's house when Twin came in with Williams's car. On the other hand, there is no proof in the record corroborating Turley's prior inconsistent statement to the police that Defendant got in and drove Williams's car after Turley got the keys from the victim.[10]

In addition to considering the strength of the State's proof of this offense, we consider the extent to which the prosecution attempted to link this crime with the erroneously consolidated subsequent crimes in its opening statement and closing arguments. See Toliver, 117 S.W.3d at 231. During opening statement, the prosecutor told the jury that he would be

---

[9] Turley also testified that Defendant was "aware" and "knew" that Turley was going to rob Williams when he pulled over. This proof was relevant to establishing that Defendant was criminally responsible for Turley's actions in robbing Williams. See Tenn. Code Ann. § 39-11-402(2) (2003) ("A person is criminally responsible for an offense committed by the conduct of another if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]").

[10] An accomplice's testimony must be corroborated by some independent proof in order to support a conviction. State v. Bough, 152 S.W.3d 453, 464 (Tenn. 2004). Corroborative proof is sufficient "'if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.'" State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994) (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)).

14

giv[ing them] the ugly inside view to what these men were doing, the ugly inside view how they were out robbing, looking for cars and rims, the ugly inside view of how they did a robbery the day before [Dexter Birge was shot] and robbed another innocent victim who thankfully didn't lose his life.

During closing argument, the prosecutor asserted that Defendant and his cohorts "chose to rob Dexter Birge" for his wheel rims and that, "[i]n fact, they did it the day before to Mexwayne Williams in the same area of town, the same motive." Later, the prosecutor argued that Defendant and his cohorts were "responsible for the terrible thing that happened to Mr. Birge and his family," and then added that Defendant was "also responsible for the day before, when he was up to no good the day before with Tommy Turley, and we find out Kelly Richardson, when they robbed Mexwayne Williams." During final summation, the prosecutor asked rhetorically whether it was "just a big coincidence" that both victims' vehicles were found at Defendant's uncle's house, and posited "I submit to you it's not a coincidence. They were involved for one reason. They wanted rims. They wanted money."

These comments were designed to encourage the jury to bolster the proof of each crime with proof of the other. This is precisely the evil that Tennessee Rule of Evidence 404(b) is designed to avoid. See Shirley, 6 S.W.3d at 251 (reversing defendant's convictions and remanding charges for retrial where trial court erroneously consolidated four armed robberies and "the credibility of . . . each witness was bolstered by the testimony of other witnesses concerning similar offenses," and consolidation "invited the jury to infer the [defendant's] guilt from a perceived propensity to commit armed robbery"); see also Dotson, 254 S.W.3d at 387 (cautioning that a "jury should not 'be tempted to convict based upon a defendant's propensity to commit crimes rather than . . . [upon] evidence relating to the charged offense'") (quoting Spicer, 12 S.W.3d at 448).

While the proof is marginally sufficient to support Defendant's conviction of the aggravated robbery of Mexwayne Williams, it is far less than overwhelming. Given the relative weakness of the State's case against Defendant for the aggravated robbery of Williams, and the prosecutor's repeated efforts to bolster the proof of each case by reference to proof of the other, we hold that the erroneous consolidation of the indictments affirmatively appears to have affected the verdict of the jury as to this offense.[11] Accordingly, Defendant is entitled to a reversal of his conviction of the aggravated robbery of Mexwayne Williams and a new trial on this charge. This result is unfortunate for both the

---

[11] We also point out, once again, that "lenience in the enforcement of such an established rule of procedure [as has been set forth regarding the consolidation of offenses] would not encourage future compliance with that rule." Dotson, 254 S.W.3d at 390.

victim and the judicial system, and results from the trial court's and the prosecution's mutual failure to apply properly the well-established law regarding the consolidation of offenses. The numerous times this Court has been constrained to reverse convictions on this basis, see, e.g., Dotson, 254 S.W.3d at 390; Denton, 149 S.W.3d at 17; Spicer, 12 S.W.3d at 449; Shirley, 6 S.W.3d at 250-51, is unsatisfactory. We therefore urge both trial courts and parties to tread more carefully in this area of criminal procedure.

First Degree Felony Murder and
Especially Aggravated Robbery of Dexter Birge

We turn now to the proof supporting Defendant's convictions of the first degree felony murder and especially aggravated robbery of Dexter Birge on March 29, 2004. The elements of first degree felony murder are (1) the killing of another (2) in the perpetration of any statutorily designated felony, including robbery. Tenn. Code Ann. § 39-13-202(a)(2) (2003). The elements of especially aggravated robbery are (1) the intentional or knowing theft of property (2) from the person of another (3) by violence or putting the person in fear (4) accomplished with a deadly weapon and (5) the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a) (2003). In this case, the proof is overwhelming that Dexter Birge was shot to death during the theft of his vehicle. The State therefore established that someone committed the crimes of first degree felony murder and especially aggravated robbery against Birge. While Defendant did not confess to these crimes, the proof of his identity as a participant in both crimes is very strong. Turley testified that he threatened Birge with a gun in order to obtain the keys to Birge's vehicle. When the two men began struggling, Defendant joined the fracas. Turley heard a shot but denied that he fired it. He testified that Defendant had a gun at the time. Willie Johnson corroborated Turley's testimony that, while Turley and Birge were fighting, a third man "came up from the side of the building" and shot the victim. Corey Richmond testified that he overheard Defendant and Turley discussing the crime and stated that he overheard Turley ask Defendant why Defendant shot the victim. According to Richmond, Defendant responded, "well, he was whupping you. I had to help you out. I had to get him up off you."

Although Defendant admitted to having been involved in the altercation between Turley and Birge, he told the police that he ran over to the fighting men simply to back Turley up. According to Defendant, it was Turley who shot Birge. However, Defendant also admitted to having gotten rid of his gun after the shooting and to having burned the clothes he was wearing at the time. "Any attempt by an accused to conceal or destroy evidence . . . is relevant as a circumstance from which guilt of the accused may be inferred." Tillery v. State, 565 S.W.2d 509, 511 (Tenn. Crim. App. 1978).

This proof is sufficiently strong to convince us that the jury would have convicted Defendant of the first degree felony murder and especially aggravated robbery of Birge even

had it not heard any proof about the crime against Williams. That is, the trial court's error in consolidating the indictments does not affirmatively appear to have affected the jury's verdict as to the two offenses committed against Birge. Accordingly, Defendant is entitled to no relief as to these convictions on the basis of the trial court's error.

## CONCLUSION

The trial court erred in failing to conduct a hearing on Defendant's objection to the State's motion to consolidate his offenses, in failing to set forth its findings of fact and conclusions of law, and in granting the State's motion. The trial court's error was not harmless with respect to Defendant's conviction of the aggravated robbery of Mexwayne Williams. We therefore reverse that conviction and remand this matter for retrial on that charge. The trial court's error was harmless with respect to Defendant's convictions for the first degree felony murder and especially aggravated robbery of Dexter Birge, and we therefore affirm those convictions. See Prentice, 113 S.W.3d at 333 (holding that erroneous consolidation was harmful as to one conviction, requiring reversal and retrial, but was harmless as to other conviction, allowing affirmance).

The costs of this cause are taxed to the State of Tennessee.

_____
CORNELIA A. CLARK, CHIEF JUSTICE

17