IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 18, 2013

# BRODERICK JOSEPH SMITH v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2009-A-501      J. Randall Wyatt, Jr., Judge**

_____

**No. M2012-02705-CCA-R3-PC    Filed October 18, 2013**

_____

The petitioner, Broderick Joseph Smith, appeals the denial of his petition for post-conviction relief, arguing he received the ineffective assistance of counsel. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JEFFREY S. BIVINS, J., joined.

Manuel B. Russ, Nashville, Tennessee, for the appellant, Broderick Joseph Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Amy Hunter Eisenbeck, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted by a Davidson County Criminal Court jury of two counts of carjacking, three counts of attempted robbery, one count of misdemeanor assault, one count of aggravated robbery, and one count of attempted carjacking and was sentenced to an effective term of eighty-nine years. State v. Broderick Joseph Smith, No. M2009-01427-CCA-R3-CD, 2011 WL 322358, at *1 (Tenn. Crim. App. Jan. 14, 2011), aff'd after remand, 2011 WL 3568110, at *1 (Tenn. Crim. App. Aug. 15, 2011), perm. app. denied (Tenn. Dec. 14, 2011). His convictions arose out of a two-day crime spree in the Nashville area on June 24 and 25, 2007, that the petitioner committed because, according to his statement to police, he needed money to buy a handgun so he could kill his ex-girlfriend, her new boyfriend, and

"who ever got in [his] way." Id. At the time of his trial, the petitioner had already pled guilty in federal court to two armed bank robberies that occurred during the crime spree. Id.

The proof at trial showed that the petitioner's crime spree began in Madison, Tennessee, when the petitioner, armed with scissors, robbed a gas station clerk of $400. Id. at *2. Later that evening, the petitioner used a knife at a gas station near Vanderbilt University to rob a driver of her purse and minivan. Id. The next day, the petitioner drove the stolen minivan to the Fifth-Third Bank on Donelson Pike in Nashville, which he proceeded to rob. Id. Within twenty minutes of the robbery, the petitioner drove to the Wachovia Bank on West End Avenue and robbed it. Id. Thereafter, the petitioner drove to the Baptist Hospital parking garage and abandoned the stolen minivan. Id. The petitioner attempted to carjack two other people in the parking garage but was unsuccessful, and he drove away in the stolen minivan and abandoned it a few blocks away. Id. at *2-3. In an alley, the petitioner threw a knife and his pants that were covered in red dye from a dye pack in the money taken from the banks into the back of a parked truck. Id. at *3.

The petitioner then tried to steal a Federal Express delivery truck. Id. The driver escaped and ran to the parking lot of the Lentz Health Center, alerting others to lock their doors as the petitioner chased her. Id. The petitioner jumped into another car and demanded the driver's keys. Id. When the driver refused, the petitioner grabbed the keys, but the driver was able to hold onto the key to the ignition. Id. The petitioner then punched a man who tried to assist the driver. Id. After that, the petitioner chased a pregnant woman, slammed her into a wall, and tried to grab her car keys. Id. Bystanders pulled the petitioner off the pregnant woman, and he started to walk away from the parking lot. Id. He was arrested a short while later, carrying a duffle bag containing a large amount of cash. Id. at *4. The petitioner was taken to the hospital, where he signed a waiver of rights and gave a statement. Id.

On direct appeal, this court affirmed the judgments of the trial court, but the Tennessee Supreme Court granted permission to appeal and remanded the case for reconsideration in light of its opinion in State v. Garrett, 331 S.W.3d 392 (Tenn. 2011). See State v. Broderick Joseph Smith, No. M2011-01173-CCA-RM-CD, 2011 WL 3568110, at *1 (Tenn. Crim. App. Aug. 15, 2011), perm. app. denied (Tenn. Dec. 14, 2011). After remand, the judgments were again affirmed, and the supreme court denied permission to appeal. Id.

On April 12, 2012, the petitioner filed a *pro se* petition for post-conviction relief and, after the appointment of counsel, an amended petition was filed. The post-conviction court conducted an evidentiary hearing, at which the petitioner testified that in June of 2007, he started "acting real irrationally" and went on a two-week drug and drinking binge after

learning that his girlfriend was not being faithful to him. He was arrested twice after smoking crack cocaine in front of police officers. He explained that he was "just acting real irrationally and . . . drinking real real heavy" during that time period. The petitioner stated that he was about fifty years old in 2007 and had used drugs off and on since the age of seventeen or eighteen.

The petitioner testified that he pled guilty to the federal charges before his case began in state court and that counsel started representing him in February 2009 when he was transported to Nashville from federal prison. He claimed that counsel told him at their first meeting that, because he had given a confession, "it was a waste of time and resources" for counsel to represent him and that it made "no sense" to challenge any of the evidence against him. He stated that "[they] started immediately having conflicts" after counsel said that to him, and he asked counsel to withdraw from the case. When counsel refused to withdraw, the petitioner called counsel's supervisor at the public defender's office, as well as wrote her letters, asking for a new attorney and complaining about counsel's representation. However, he was told that he could not be assigned another attorney and that he had "to make the best of it."

The petitioner testified that, in 1982, when he was twenty-six years old, he underwent a mental evaluation at Vanderbilt Psychiatric Outpatient Clinic because "[i]t was a stipulation of [his] parole from TDOC that [he] get mental health treatment." He was diagnosed with "a thinking disorder, a cognitive dysfunction" and was prescribed psychotropic medications. However, against medical advice, he dropped out of treatment and stopped taking his medication, and "progressively over the years [his] condition worsen[ed]." He said that at the time of the bank robberies, he was experiencing "some mental . . . anguish" and was "also under the influence of cocaine and alcohol too heavily[.]"

The petitioner testified that he told counsel "everything" about his mental health issues, drug use, and mental state at the time of the incident. He said that he asked counsel if he was going to challenge any of the evidence, but counsel told him there "ain't nothing that I can do for you" because he had signed a confession. The petitioner did not know whether counsel filed a motion to suppress his statement.

The petitioner testified that he was not given a mental evaluation until after the trial, when the attorney handling a matter in federal court suggested that he be evaluated and counsel "jumped on the band wagon." He recalled that federal counsel obtained funding from the federal court to have him evaluated by an "addiction specialist," Dr. Murray Smith, in relation to his federal matter. The petitioner said that federal counsel's representation overlapped with trial counsel's representation in state court, and he was certain that the two attorneys talked several times.

The petitioner testified that, at the time of the incident, his ex-girlfriend and her new boyfriend both worked at Vanderbilt Hospital, and he told counsel that his plan had been to go there and kill them and anybody else who got in his way. The petitioner believed that counsel's wife worked as a psychologist at Vanderbilt. The petitioner felt that counsel's continued representation was a conflict "because [the petitioner was] talking about going out there and killing these folks at the hospital and [counsel's] wife works there and she could have got caught up in all of that[.]" He told counsel that was another reason for him to withdraw from the case. When counsel said that he would not withdraw, the petitioner contacted the public defender and told her about the potential conflict, but she told him "that [was] not going to affect [counsel]'s representation of [him]."

The petitioner testified that he was brought back to Nashville a little more than a month before his mid-March trial. He recalled having discussions with counsel about the trial date. He told counsel that they could go to trial "whenever you say we are ready . . . since it seems like I can't get rid of you." The petitioner did not recall counsel's ever saying that there were other things he could do if he had more time, and he denied telling counsel that he wanted to have a trial rather than ask for more time to prepare. The petitioner did not think that counsel "put on much of a case for [him]," called any defense witnesses, or challenged any of the testimony or the confession.

On cross-examination, the petitioner did not remember filing a motion for speedy trial, explaining that it had been almost four years ago but that he would "take [the State's] word for it." He acknowledged that he had written numerous letters to the public defender and the district attorney about speeding up his transfer from federal custody under the Interstate Compact on Detainers. It was his understanding that, under the Compact, he had to be transferred to state custody and tried within 180 days after the request was filed. He said that he "wrote some letters trying to get back here, trying to expedite [his] transfer[,] . . . [n]ot requesting a speedy trial."

The petitioner acknowledged that the mental evaluation for his federal proceedings took place after his state trial and that, if a similar evaluation had taken place before his state trial, it would have taken time and required that he agree to being tried outside of the 180-day period. However, he could not remember whether he was willing to waive his 180-day period. The petitioner said that he thought counsel should have called his landlord to testify at trial because the landlord "kn[e]w the anguish that [he] was going . . . through and stuff[.]" He admitted committing the offenses but said, "[W]hen I signed the confession[,] I was out of my mind."

Trial counsel testified that he had worked in the public defender's officer at two different times for a total of twenty-four or twenty-five years. He became involved in the

case on the day of the petitioner's arraignment. However, other attorneys in the office "had extensive contact" with the petitioner prior to that in assisting him with the Interstate Compact on Detainers process. He recalled that "[t]here was a somewhat inexplicable delay in getting him here." By counsel's calculations, when the petitioner arrived in the state, "he had to be tried within 180 days of his request . . . [i]n other words, 32 days later." He said that the petitioner "was very acutely aware" of the time frame in which his case had to be tried and was unwilling to waive the 180-day requirement because doing so would have eliminated "the potential motion to dismiss in the plausible event the State was unable to bring him to trial within those 32 days." The petitioner was also aware that waiving the 180-day requirement would give counsel additional time to prepare for trial and file potential motions, but the petitioner "absolutely did not want to waive the 180 days."

Counsel testified that he knew the petitioner was represented by federal counsel in his federal habeas corpus action, which concerned the attorney appointed to represent the petitioner on the federal bank robbery charges. Although the petitioner's federal, trial-level attorney was willing to provide information to counsel, the petitioner "absolutely prohibited [counsel] from getting with [federal trial counsel] about the case . . . or obtaining documents from him[.]" Counsel was particularly interested in obtaining the federal presentence report because he thought that it would contain information about the petitioner's social and treatment history. He "thought that would have been a critical document for trying to determine whether or not there were any such avenues to be explored." Counsel also had several informal conversations about the case with federal habeas counsel, but they did not "exchange any significant information" until after the trial. Both federal trial and habeas counsel offered to provide the document if the petitioner signed a release, but the petitioner would not do so. Counsel also contacted an Assistant United States Attorney, who told him that giving him a copy of the report would violate federal law. Counsel filed a motion in district court to have the document released, and "it was summarily dismissed without a hearing."

Counsel testified that the petitioner wanted him to file a motion to suppress the statement due to "his profound intoxication by use of drugs and his distraught emotional state." However, the petitioner told counsel that he was the only possible witness to those matters. Counsel also reviewed the statement and thought that the petitioner responded coherently to the detective's questions and "d[id]n't sound crazy." He did not think the statement had a "[]gross indicia of invalidity" and said they "would have need[ed] to have had a lot more information about [the petitioner]'s mental health" to have an effective motion to suppress. Counsel reiterated that it was a tactical decision to not file a motion to suppress "in the sense that [he] didn't feel that [they] had enough information to prevail on it[.]"

Counsel was aware of the petitioner's complaint that he should have withdrawn from

the case because the petitioner had planned to kill people at Vanderbilt, where counsel's wife happened to work. However, counsel explained that the petitioner was in error because his wife did not work at Vanderbilt. He said that her practice was at Baptist Hospital and that, although some of the incidents happened in the parking garage there, she actually parked in a lot for physicians. He "did not feel morally conflicted" by his representation of the petitioner and, if anything, "felt somewhat advantaged because at least [he] knew the layout of the building."

Counsel said that, had he requested a mental health evaluation to determine the petitioner's state of mind at the time of the offenses, it would have required the petitioner to waive the 180-day limit which the petitioner was not willing to do.

On cross-examination, counsel agreed that any delay past the 180 days was a non-negotiable issue with the petitioner. He said that there were "promising avenues or areas," particularly the petitioner's mental health situation, that he and the petitioner "wanted to explore [that] were terminated by the short time frame." Counsel could have gotten the petitioner evaluated for competency to stand trial and insanity at the time of the offenses within the thirty-two days, but he did not feel that either "of those two things were at issue." However, he thought it would have been "promising" to explore the petitioner's intent at the time of the commission of the crimes. Counsel noted that the petitioner "demonstrated a strong knowledge of many aspects of the law," particularly in the area of the Interstate Compact on Detainers, and he did not think the petitioner was confused about the proceedings. In counsel's opinion, the petitioner "was clearly competent, angry, but competent.

Counsel did not think that a "standard evaluation" would have been helpful but that a more in-depth evaluation, involving "some prodigious record collection" and obtaining funds to employ a private mental health professional, could have been advantageous to the defense. He would have had such professional explore the petitioner's waiver of rights. Counsel knew that the petitioner had claimed "heavy drug use" during the time period of the offenses and when he gave his statement. He spoke with the petitioner's federal habeas counsel before the petitioner's state trial about mental health defenses and learned that she intended to employ an addictionologist. After the trial, federal habeas counsel sent counsel a copy of the addictionologist's report. Counsel agreed that the information in the report could have been helpful, and he "certainly could have considered it" had it been available before trial.

Counsel agreed that trying to negate the mens rea for the offenses would have been the best, if not only, avenue of defense. However, counsel noted that the mens rea for carjacking was intentional or knowing, and he "thought it would have been a tremendous

-6-

leap to be able to show to a jury that [the petitioner]'s conduct that day was not knowing." Counsel agreed that the petitioner's statement to the police was unfavorable and that with some of this additional information he would have potentially had a good faith basis for filing a motion to suppress.

Counsel testified that he and the petitioner had a somewhat contentious relationship and that the petitioner decided "very quickly" that he did not want counsel as his lawyer and asked him to withdraw. Counsel did not recall telling the petitioner it was a waste of time and resources to represent him, and he noted that "it doesn't sound at all like me." Counsel said that he probably would have told the petitioner that the fact he confessed made it difficult to prepare an effective defense.

Counsel agreed that he would have liked to have taken additional steps to investigate the petitioner's mental health but for the petitioner's insistence on being tried within the 180-day time frame. He told the petitioner that he could "do more" if he had more time and maintained that they "definitely had a conversation about that." He said that the petitioner told him about a couple of physicians who "had critical information," but counsel could not find them after a thorough search. Counsel maintained that the fact that his wife worked in the vicinity of the petitioner's crime spree did not affect his representation.

On redirect examination, counsel testified that, at the time he represented the petitioner, he had "very few cases" and was able to "devote significant amounts of time to the case." His records reflected that over ninety-nine hours of attorney time and twenty-six hours of staff time were spent on the petitioner's case.

After the hearing, the post-conviction court entered a written order concluding that none of the petitioner's allegations had merit.

## ANALYSIS

### I. Ineffective Assistance of Counsel

On appeal, the petitioner raises three allegations of ineffective assistance of counsel. He asserts that counsel was ineffective for failing to have him evaluated for competency, failing to file a motion to suppress his statement, and failing to withdraw due to a potential ethical conflict.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive

on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a post-convictions court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both

components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

## A. Mental Evaluation

The petitioner argues that counsel was ineffective for failing to have a mental health professional evaluate him "for competency to stand trial and/or other mental health analysis that could help in [his] defense." He asserts that there were "red flags" in his behavior and history that should have put counsel on notice that a further investigation into his mental health was warranted.

At the evidentiary hearing, counsel testified that, had he requested a mental health evaluation to determine the petitioner's state of mind at the time of the offenses, it would have required the petitioner to waive the 180-day limit which the petitioner was not willing to do. Counsel could have gotten the petitioner evaluated for competency to stand trial and insanity at the time of the offenses within the time period remaining, but he did not feel that either "of those two things were at issue." Counsel noted that the petitioner "demonstrated a strong knowledge of many aspects of the law," particularly in the area of the Interstate Compact on Detainers, and he did not think the petitioner was confused about the proceedings. In counsel's opinion, the petitioner "was clearly competent, angry, but competent."

Counsel did not think that a "standard evaluation" would have been helpful but that a more in-depth evaluation, involving "some prodigious record collection" and obtaining funds to employ a private mental health professional, could have been advantageous to the defense. However, any area counsel thought worth exploring was foreclosed by the petitioner's insistence on not delaying the trial past the 180 days, which was a non-negotiable issue with the petitioner.

The petitioner testified that he did not recall counsel's ever saying that there were other things he could do if he had more time, and he denied telling counsel that he wanted to have a trial rather than ask for more time to prepare. He acknowledged that a mental evaluation would have taken time and required that he agree to being tried outside of the 180-day period, and he could not remember whether he was willing to waive the 180-day period.

In ruling on this issue, the post-conviction court accredited counsel's testimony in finding that, "in proceeding to trial without a mental health evaluation, [counsel] was following the [p]etitioner's adamant and explicit instructions." The petitioner has not shown that counsel performed deficiently, and the record supports the post-conviction court's

determination.

## B.  Motion to Suppress

The petitioner argues that counsel was ineffective for failing to file a motion to suppress his statement in light of his "serious drug use around the time of the offenses and his potential mental health issues."

Counsel testified that the petitioner wanted him to file a motion to suppress the statement due to "his profound intoxication by use of drugs and his distraught emotional state." However, the petitioner told counsel that he was the only possible witness to those matters. Counsel also reviewed the petitioner's statement and thought that the petitioner responded coherently to the detective's questions and "d[id]n't sound crazy." Counsel did not think the statement had a "[]gross indicia of invalidity" and said they "would have need[ed] to have had a lot more information about [the petitioner]'s mental health" to have an effective motion to suppress. The petitioner's federal trial and habeas counsel offered to provide counsel with the petitioner's federal presentence report, which counsel thought might contain "critical" information about the petitioner's social and treatment history, but the petitioner would not sign a release for counsel to obtain the document. Counsel stated that it was a tactical decision to not file a motion to suppress "in the sense that [he] didn't feel that [they] had enough information to prevail on it[.]"

In ruling on this issue, the post-conviction court found that counsel's determination to not file a motion to suppress "was entirely reasonable." Moreover, the post-conviction court noted that there was "a substantial amount of evidence" against the petitioner, supporting the court's conclusion that the petitioner did not demonstrate that there is a reasonable probability that the result of the proceeding would have been different had the statement been suppressed.

## C.  Withdrawal from Representation

The petitioner lastly argues that counsel was ineffective for failing to withdraw due to an "ethical conflict" based on the petitioner's having told counsel that he had intended to commit mass murder at Vanderbilt, where the petitioner believed counsel's wife worked.

Counsel testified that his wife did not work at Vanderbilt; her practice was at Baptist Hospital. He said that some of the incidents happened in the parking garage at Baptist, but his wife parked in a lot for physicians. Counsel stated that he "did not feel morally conflicted" about representing the petitioner and, if anything, "felt somewhat advantaged because at least [he] knew the layout of the building." Counsel maintained that the fact that

his wife worked in the vicinity of the petitioner's crime spree did not affect his representation.

The court found that the petitioner was mistaken in his facts and that, even though some of the conduct occurred in the parking garage at Baptist Hospital, "there was no substantial connection between this conduct and [counsel]'s wife." The court concluded that counsel "had no conflict of interest that would impede his ability to represent the [p]etitioner." The petitioner has not shown that counsel performed deficiently, and the record supports the post-conviction court's determination.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE