IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 18, 2012

# STATE OF TENNESSEE v. JAMES ALLEN GOOCH, JR.

**Appeal from the Criminal Court for Sumner County**
**No. 792-2009      Dee David Gay, Judge**

_____

**No. M2011-01135-CCA-R3-CD - Filed September 25, 2012**

_____

A jury convicted appellant, James Allen Gooch, Jr., of one count of the sale of not less than one-half ounce of marijuana, a Schedule VI controlled substance, within 1,000 feet of a school, a Class D felony, and one count of attempted sale of .5 grams or more of cocaine, a Schedule II controlled substance, a Class C felony. The trial court ordered appellant to serve consecutive sentences of twelve years in the Tennessee Department of Correction for the Class D felony and fifteen years for the Class C felony. On appeal, appellant argues that the trial court erred in denying his motion to sever and in sentencing him as a persistent offender. After reviewing the record, the parties' briefs, and applicable law, we conclude that the trial court did not abuse its discretion in denying the motion to sever the offenses and that the trial court properly sentenced appellant. Accordingly, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Joseph B. Freedle (on appeal) and Kenneth J. Phillips (at trial), Gallatin, Tennessee, for the appellant, James Allen Gooch, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Lytle Anthony James, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Background Facts

A Sumner County grand jury indicted appellant in count one for the sale of not less than one-half ounce of marijuana, a Schedule VI controlled substance, within 1,000 feet of a school, and in count two for attempt to sell .5 grams or more of cocaine, a Schedule II controlled substance. The sale of marijuana occurred on January 22, 2009, and the attempted sale of cocaine occurred on February 23, 2009. Appellant was convicted as charged after a jury trial at which the parties presented the following evidence:

David Kyle Irwin, an investigator with the 18th Judicial District Drug Task Force, testified that on January 22, 2009, he participated in an investigation involving the purchase of marijuana from appellant. Investigator Irwin was working undercover and planned to use a confidential informant to introduce him to appellant. The purpose of the introduction was to arrange for Investigator Irwin to purchase narcotics from appellant. He explained that his personal purchase of the narcotics and being the direct witness was better than the confidential informant doing so. In addition to the confidential informant, Investigator Irwin was also working with Investigators Joe Russell and Ed Williams. The plan for the investigation was for the informant to introduce Investigator Irwin to appellant. The informant and Investigator Irwin were going to buy marijuana from appellant while inside the informant's apartment. The investigators planned to audio record and videotape the transaction.

Investigator Irwin testified that in preparation for the controlled purchase, the investigators explained the procedure to the informant, and the informant told the investigators from whom he would be purchasing drugs. The investigators equipped the informant with a listening device so they could listen to and record the conversation of the informant and seller. Investigator Irwin explained that before they allowed the informant to make a controlled purchase, the investigators searched the informant for contraband and money. The informant could not possess his own money, drugs, or weapons while participating in a controlled purchase. The task force gave the informant money to purchase the drugs and recorded the serial numbers from the money they gave him. They also searched the informant after the transaction to ensure that he did not have any money or drugs other than that which he had purchased during the transaction. After the transaction, the informant gave the investigators the narcotics he purchased.

During the first controlled purchase in this case, Investigator Irwin and the confidential informant were downstairs in the informant's apartment, and Investigator Russell was upstairs. No other person was in the apartment. The informant called appellant,

who was to come inside the apartment to sell the drugs. However, when appellant arrived, he called the informant and told him to come outside to buy the drugs. Investigator Irwin testified that drug dealers, particularly experienced drug dealers, would often change meeting locations as a precaution to avoid the police.

Investigator Irwin observed a green Yukon SUV while looking out the window of the informant's apartment. He was unable to identify anyone inside the Yukon. The informant went outside, walked to the Yukon, and completed the transaction. After the transaction, the informant went back inside of the apartment, gave Investigator Irwin a bag of marijuana, and told him that he bought it from appellant. Investigator Irwin identified the marijuana the informant bought from appellant. The informant also told Investigator Irwin that he and appellant discussed "drug activity."

On cross-examination, Investigator Irwin testified that it was dark during the purchase, and he did not see or hear appellant. He did not listen to the audio recording of the transaction and could not say whether appellant's voice was on it. Investigator Irwin was unaware of any videotape of appellant participating in the transaction. Investigator Irwin said it would have been better if he had completed the transaction because he was a sworn police officer, and "it's always better to have a police officer as an eyewitness."

Investigator Irwin stated that the task force's confidential informants were either people who volunteered or people "working off charges." When asked whether informants who were "working off charges" were biased, Investigator Irwin answered, "I'll say it's just all on the individual. We . . . won't let someone be an [sic] CI for us if we're not confident." He stated that every confidential informant had an "agenda, whether it's just to do their part to get drugs off the street or to fulfill an agreement that they have with the task force."

Investigator Irwin did not have any knowledge about the telephone number the informant called before the purchase. From talking to other investigators, he learned that appellant drove the green Yukon SUV. Investigator Irwin agreed that it was better to have both parties recorded with the listening device so the investigators would have more evidence upon which to build their case.

Special Agent Forensic Chemist John Scott testified that he worked in the drug identification unit at the Tennessee Bureau of Investigation (TBI). Agent Scott identified a substance that he analyzed for this case. The report from his analysis showed that the substance was "marijuana, weighing 19.1 grams, . . . a Schedule VI controlled substance in the state of Tennessee."

Investigator Ed Williams with the 18th Judicial District Drug Task Force testified that he was involved in the January 22, 2009 controlled purchase. Investigator Williams said the purchase did not go as planned, which was common. The purchase occurred at an apartment complex that was 850 to 920 feet from the Rucker-Stewart Middle School. Investigator Williams provided security and surveillance during the transaction. He was between eighty and one hundred feet from the apartment in which the transaction was supposed to occur.

Investigator Williams testified that he observed a Yukon enter the apartments' parking lot and stop in front of the informant's apartment building between 6:00 and 6:30 p.m. on January 22nd. The confidential informant exited his apartment and approached the Yukon. The informant stayed at the vehicle for a short time. Investigator Williams was watching the suspect in the Yukon and did not see the informant re-enter the apartment. The person in the Yukon then drove through the parking lot, passing approximately fifteen feet from Investigator Williams, and parked in a space. Investigator Williams identified appellant and said appellant exited the parked Yukon. He said that he was certain he saw appellant, and there was no mistaking his identification of appellant.

Investigator Williams was also involved in the controlled purchase on February 23, 2009. He was assigned to drive the informant to the transaction. Between 6:00 and 6:30 p.m., Investigator Williams drove the informant to the Save-A-Lot on East Main Street in Gallatin, Tennessee. While they were traveling to the location, appellant called the informant and told him to exit the vehicle and go to the side of the building when he arrived. According to Investigator Williams, "it was not a big deal" for the informant to go to the side of the building because security officers were in the area; however, Investigator Williams did not know what was occurring beside the building because he did not have any listening equipment.

When they arrived at the Save-A-Lot, the informant exited the vehicle and went to the side of the building. Investigator Williams lost sight of the informant for approximately three minutes. The informant reappeared and opened the passenger side door to get back inside the vehicle with Investigator Williams. A white Cadillac then approached them from the side of the Save-A-Lot where the transaction had taken place. The Cadillac parked perpendicularly behind Investigator Williams' vehicle. Investigator Williams saw appellant driving the vehicle with an unknown passenger. The informant held out his hand toward Investigator Williams, and Investigator Williams saw "a clear bag, cellophane, appeared to be a knot in it, with an off-white substance inside of it." The informant stood outside of the passenger door and had a conversation with appellant, who was still in the Cadillac. The informant then walked to the rear of Investigator Williams' vehicle, and the Cadillac pulled into the parking space next to Investigator Williams. Investigator Williams observed appellant in the vehicle, which was less than ten feet away.

The informant "exchanged words" with appellant and got into the backseat of the Cadillac. The Cadillac drove away, and Investigator Williams immediately chased it. The Cadillac turned on several streets before the informant exited the vehicle. Investigator Williams stopped and made sure the informant was not injured. The informant got into Investigator Williams' car, and they went back to the drug task force office. The informant no longer had the cocaine with him, but he had the money the investigators had given him.

On cross-examination, Investigator Williams used a diagram to identify where the parties were during the January 22nd transaction. He said that there were no cars between his vehicle and the apartment building. Investigator Williams identified where the lights were in the parking lot and on the buildings. He stated that he was unable to see the transaction or the driver of the vehicle involved in the transaction. Investigator Williams had experience with appellant and could "visualize him." After the transaction, he could see a side view of appellant's face using the "ambient light" coming from the buildings. He said that appellant went into an apartment eighty-two feet away from him.

Investigator Williams further testified that Investigator Joe Russell[1] assigned him the role of a security officer during the January 22nd controlled purchase. He did not give Investigator Williams any information about the transaction. Investigator Williams did not know where the transaction was going to take place until he arrived at the scene. Once there, Investigator Russell told him the transaction was going to take place inside an apartment that police had wired for video and audio.

Investigator Williams stated that when he picked up the informant after the second transaction, he told Investigator Russell and Assistant Director Murphy to broadcast over the police radio a "BOLO, a be-on-the-lookout" for the Cadillac. He did not physically see the transaction between appellant and the informant and did not know whether the other officers who participated saw it. Investigator Williams said the substance he saw the informant holding appeared to be an off-white substance, and its packaging was consistent with cocaine.

The informant testified that he began working as an informant with the drug task force in 2008 after he pled guilty to criminal charges. He agreed to complete controlled purchases for the task force to "work[] off" his charges. The informant set up a drug transaction between himself and appellant on January 22, 2009, at the Green Wood Apartments. He purchased an ounce of marijuana from appellant during the transaction.

---

[1] The record is unclear as to whether Joe Russell was the Director of or an Investigator with the drug task force. Witnesses referred to him as both Director and Investigator in the transcript.

The informant stated that before the transaction at the Green Wood Apartments, drug task force officers searched and "wired" him. The controlled purchase was supposed to take place inside his apartment. He was downstairs in the apartment, and Investigators Irwin and Russell were upstairs. No one else was inside the apartment. The informant went outside to purchase the marijuana from appellant instead of appellant coming inside the apartment as originally planned. He gave appellant $150 for the ounce of marijuana. After the transaction, he immediately brought the marijuana inside to the investigators. He said that the investigators weighed the marijuana, and it was "a couple grams short" of an ounce.

The informant further testified that he entered appellant's vehicle while they completed the transaction. No one else was inside the vehicle. While inside the vehicle, appellant told the informant that he could get cocaine for his friend to purchase. The State played an audio recording, and the informant identified his own voice and Investigator Russell's voice on the recording. At trial he did not hear appellant's voice due to the quality of the recording; however, he recalled previously hearing a discussion about "flake" on the recording. He explained that "flake" was a slang term for cocaine.

The informant arranged a transaction to buy cocaine from appellant. The State played a recording of telephone calls he made attempting to set up the transaction. On the first call, the informant told appellant he wanted to purchase "powder," which was cocaine. Appellant asked the informant how much cocaine he wanted to purchase, and the informant told him "a G." He explained that "a G" meant one gram. During their last call, appellant asked the informant if his friend was "cool." According to the informant, appellant was reluctant to meet new people, but the informant told him, "[H]ey, this guy is cool; you know, I've know[n] him a long time."

On February 23, 2009, the informant went to Save-A-Lot to complete the cocaine purchase. Appellant drove his vehicle beside the investigator's vehicle in which the informant was a passenger and stopped. Appellant had another person in the vehicle with him. The informant got out of the investigator's vehicle and got into the backseat of appellant's vehicle. He said that he purchased a gram of cocaine from appellant and returned to the investigator's vehicle. He further said that appellant claimed that he knew that the drug task force was conducting surveillance of him so appellant told him that he had shorted him on the sale. Appellant asked him to return the cocaine so that he could "make it right." The informant got back inside of appellant's vehicle, and appellant "sped out of the parking lot." Appellant returned to the informant the $60 with which he had purchased the cocaine and took back the cocaine. Appellant then allowed the informant to exit the vehicle at a stop sign where an investigator found him.

On cross-examination, the informant testified that he received probation for charges he was facing, but the probation was later "dropped." While he was on probation, authorities arrested him for writing a worthless check. After completing the transactions with the drug task force and paying the necessary fines, the worthless check charge was dismissed. He denied that he lived his life by lying to authorities.

The informant stated that a detective with the local police department asked him to complete controlled purchases for them. He said he did not feel any pressure to participate in the purchases and was "more than willing" to do so. He denied that he participated because his charges would be dismissed and stated his charges were dismissed because his wife had paid his fines.

Kelly Murphy, the director of the drug task force, testified that the task force depended on the help of confidential informants. He said the most common type of confidential informants were defendants who were trying to work off charges or gain favorable prosecutions. He explained that

[c]onfidential informants have a lot better knowledge of the organization as a whole, as far as how it work[s], because nine times out of ten they've . . . been there and done it, bought it. They know who they're up against, they know their patterns, they know their procedures, and that type of information is what [the task force] survive[s] off of.

Director Murphy further testified that it was very common for controlled purchases to not go as planned. At the time of the controlled purchases involving appellant, he was the assistant director of the drug task force and was a security officer in the second controlled purchase. Director Murphy was near the purchase and responded when he learned that the informant had gotten into appellant's vehicle.

Director Murphy identified his markings on an evidence package. He explained that when an investigator "makes a case," he or she secures the evidence and brings it to the drug task force office where it is photographed, weighed, and sealed. The investigator then places the evidence in a lock box to which only the director has a key. Approximately once a month, investigators take the evidence to the TBI for testing. The evidence remains in the TBI's custody until a member of the task force recovers it. Director Murphy said the evidence in this case was a clear baggy containing a "plant-like substance." The task force did not initially classify it as marijuana because the TBI laboratory had to determine the actual contents. The evidence package indicated that Investigator Russell recovered the marijuana and that appellant was the suspect. The task force kept the informant's name in a separate record.

On cross-examination, Director Murphy testified that he was not present for the transactions and could not identify appellant. He stated that the task force "tr[ied] to take information that [the informants] give and corroborate information prior to [the task force] using them." Director Murphy stated that the report for this case showed that the informant first handed the marijuana to Investigator Irwin. Investigator Irwin then gave the marijuana to Investigator Russell.

Investigator Russell testified that he was a member of the drug task force in January and February of 2009. He participated in an investigation using a confidential informant and targeting appellant. The informant had been in contact with Larry Burke, an investigator with the Gallatin Police Department. The informant was working off a drug charge from Gallatin. Investigator Burke informed Investigator Russell that the informant had drug information and asked Investigator Russell what he could do with that information using the informant.

Investigator Russell stated that the informant identified appellant from photographs and told the task force that he could purchase drugs from him. The informant called appellant and arranged the purchase of marijuana. The first transaction took place at the informant's apartment complex on Green Wave Drive. Using a photograph, Investigator Russell identified where the purchase occurred and the location of Rucker-Stewart Middle School.

Investigator Russell further testified that he, Investigator Irwin, and the informant were the only people in the informant's apartment during the January 22nd drug purchase. Appellant was to go inside the informant's apartment and meet Investigator Irwin so that they would be familiar with each other later. Investigator Russell also planned to videotape appellant selling marijuana in the apartment.

Investigator Russell was upstairs in the informant's apartment looking out the front window when the purchase occurred. While looking out the window, Investigator Russell saw "a green GMC Yukon, SUV type vehicle pull up in the front of the parking lot, facing the building[,] and as [he] was looking down the vehicle was to [his] right." Investigator Russell also saw the informant leave the apartment, go to the passenger side of the Yukon, engage in a brief conversation with a male occupant of the Yukon, and go directly back into his apartment. Investigator Russell did not see the male occupant of the vehicle.

Before the informant went to make the transaction, the investigators searched him to make sure that he did not have any contraband and equipped him with a "police consensual listening device." Investigator Russell listened to the audio recording in real time, and he heard the conversation between the informant and the occupant of the Yukon. He said the

men had a short conversation before the informant returned to the apartment and gave the evidence, a "green plastic baggie of plantlike material," to Investigator Irwin. Investigator Russell was also involved with the second transaction on February 23rd. He said that the investigators met with the informant, made several recorded calls to appellant, and arranged for appellant to sell approximately one gram of cocaine to the informant.

On cross-examination, Investigator Russell testified that as the "case agent" for the controlled purchase, he was responsible for the logistics of the transaction. He had done several controlled purchases in the past and said that before the one on January 22nd, all of his controlled purchases had gone according to plan. He stated that if they had gotten appellant inside the apartment, the controlled purchase would have been perfect because Investigator Irwin could have spoken to appellant directly. The investigators intended to introduce appellant to Investigator Irwin so that Investigator Irwin could later purchase drugs from appellant. He said that having Investigator Irwin as an eyewitness would have been better than having the informant as an eyewitness because Investigator Irwin was an officer, and his testimony would have been "hands-on."

Investigator Russell testified that he knew the informant had a background of narcotic use and had been arrested for traffic violations and for filing a false police report. He said the false report charge was dismissed but agreed it was an arrest involving untruthfulness. He further agreed that having the same level of confidence in the informant's testimony as they would have in Investigator Irwin's testimony would be difficult for people.

Investigator Russell stated that when a suspect did not go to where the investigators set up surveillance, as in this case, officers just observed the transaction in person, and the informant's listening device recorded the transaction. Investigator Russell stated that getting appellant inside the apartment would have also been beneficial because the apartment was a closed environment. Also, the investigators set up surveillance equipment inside the apartment to record appellant. Investigator Russell said that he did not see appellant during the transaction, but he heard the informant and appellant talking in real time over the consensual listening device. Investigator Russell did not listen to the recorded tape. Investigator Russell did not know whether there were "still cameras" at the scene of the controlled purchase.

After hearing the evidence, the jury found appellant guilty of one count of the sale of not less than one-half ounce of marijuana, a Schedule VI controlled substance, within 1,000 feet of a school and one count of attempted sale of .5 grams or more of cocaine, a Schedule II controlled substance. The trial court held a sentencing hearing on April 11, 2011. The trial court found that appellant was a Range III, persistent offender. The court sentenced appellant to twelve years for count one and fifteen years for count two. The trial court

ordered that appellant serve his sentence for count one consecutively to a previous ten-year sentence that he was serving and ordered him to serve his sentence for count two consecutively to count one. Appellant appealed his convictions and sentences to this court.

## II. Analysis

### A. *Motion to Sever*

For his first issue, appellant argues that the trial court erred when it denied his motion to sever the offenses. He contends that the trial court abused its discretion by "reaching two conclusions, based on the information before [it] at the [motion to sever] hearing, which defied logic and resulted in an injustice to [appellant]." The State responds that the joinder of offenses about which appellant complains was initially done at appellant's request and that the trial court properly exercised its discretion in denying the motion to sever.

Appellant filed a motion to sever on February 9, 2010, which the State did not oppose. Without a hearing or argument, the trial court entered an order severing the offenses on March 29, 2010. On December 3, 2010, appellant's trial counsel made a motion, in open court, to rejoin the offenses. Trial counsel told the trial court that appellant realized trying two counts as opposed to one could be prejudicial to him, but he was "very much wanting to have both of these charges tried at the same time." The trial court rejoined the offenses on December 6, 2010. Appellant orally made a second motion to sever on January 7, 2011, three days before the trial. Appellant filed a written motion to re-sever the offenses on January 10, 2011. Trial counsel asked the court to sever the offenses because trying them separately would better serve appellant and be less prejudicial and inflammatory. The trial court denied the motion to sever.

On appeal, we review a trial court's decision whether to sever offenses pursuant to Tennessee Rule of Criminal Procedure 14(b)(1) under an abuse of discretion standard. *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999); *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008). "An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *Dotson*, 254 S.W.3d at 392 (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

Here, the State permissively joined the offenses in the same indictment pursuant to Tennessee Rule of Criminal Procedure 8(b), which provides that

[t]wo or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13, if:

(1) the offenses constitute parts of a common scheme or plan; or

(2) they are of the same or similar character.

When the State joins offenses pursuant to Rule 8(b), a defendant is entitled to severance of the offenses "unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1).

Before denying a motion for severance, the trial court must hold a hearing on the motion, and the court must conclude from the evidence and arguments presented at the hearing that

(1) the multiple offenses constitute parts of a common scheme or plan; (2) evidence of one of the offenses is relevant to some material issue in the trial of the other offenses; and (3) the probative value of the evidence of the other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

*Dotson*, 254 S.W.3d at 387 (citing *Spicer v. State* 12 S.W.3d 438, 445 (Tenn. Crim. App. Feb. 7, 2000)).

We note that the trial court denied the second motion to sever without a full evidentiary hearing in which the parties presented testimony. As stated in the appellant's brief, there were only "statements, stipulations, and arguments by counsel." After hearing arguments by counsel, the trial court determined that severance was not required. Regarding the facts of the case, the trial court stated that "it's been kind [of] stipulated here just what the facts would be or the evidence would be in these particular cases." When ruling on the motion in a jury-out pretrial hearing, the trial court relied on the stipulated facts without any further evidence. However, it appears from a review of the record that not all of the relevant facts were agreed upon by the parties.

When reviewing a denial of a motion to sever on appeal, a trial court's failure to have a full evidentiary hearing[2] does not automatically warrant joinder. *State v. Michael Montell*

---

[2]We recognize that appellant's motion to sever was presented in open court on a Friday before a
(continued...)

-11-

*Williams*, No. E2010-02402-CCA-R3-CD, 2011 WL 5137179, at *16 (Tenn. Crim. App. Oct. 28, 2011) (citing *State v. Garrett*, 331 S.W.3d 392, 404 (Tenn. 2011), *perm. app. denied* (Tenn. Mar. 6, 2012). In order for this court to make the determination of whether the trial court's denial of the motion to sever was an abuse of discretion, we must consider the evidence presented at trial. *Garrett*, 331 S.W.3d at 404 (citing *State v. Toliver*, 117 S.W.3d 216, 228 n. 4 (Tenn. Crim. App. 2003). *See Michael Montell Williams*, 2011 WL 5137179, at *16; *State v. Todd Joseph Sweet*, No. E2010-00728-CCA-R3-CD, 2011 WL 6318506, at *21 (Tenn. Crim. App. Dec. 16, 2011), *perm. app. denied* (Tenn. Apr. 11, 2012); *cf Spicer*, 12 S.W.3d at 445 ([B]ecause the trial court's decision of whether to consolidate offenses is determined from the evidence presented at the hearing, appellate courts should usually only look to that evidence, along with the trial court's findings of fact and conclusions of law, to determine whether the trial court abused its discretion by improperly joining the offenses.).

Regarding the first factor, that the multiple offenses constitute parts of a common scheme or plan, our supreme court has recognized "three types of common scheme or plan evidence: (1) offenses that reveal a distinctive design or are so similar as to constitute 'signature' crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction." *Shirley*, 6 S.W.3d at 248 (citing Neil P. Cohen et al., *Tennessee Law of Evidence* § 404.11, at 180 (3d ed.1995)). Here, the purchase and attempted purchase clearly do not constitute signature crimes and were not part of the same criminal transaction. Thus, we must consider whether the transactions were part of a continuing plan or conspiracy.

In the instant case, the trial court, noting that the proof had to show "a working plan operating towards the future with such force as to make probable the crime with which the defendant is charged," concluded that the offenses were a part of a larger continuing plan or conspiracy. *See State v. Denton*, 149 S.W.3d 1, 15 (Tenn. 2004) (citing *State v. Hoyt*, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995), *overruled on other grounds by Spicer*, 12 S.W.3d at 447). The evidence in the record shows that on January 22, 2009, the informant called appellant and arranged to purchase marijuana from appellant. During the recorded telephone calls arranging the purchase of marijuana, appellant asked the informant if his friend was interested in "the other," meaning cocaine. The informant replied, "[H]e'd like to look at some of it because he'd be interested in it when his old lady lets him turn loose a little more

---

[2](...continued)
Monday trial date. A full evidentiary hearing would necessarily have resulted in a continuance or significant delay of the trial. Trial courts should try to eliminate last minute motions by setting a deadline for pretrial motions pursuant to Rule 12(c) of the Tennessee Rules of Criminal Procedure. Of course, a defendant must be allowed to move for severance on or before the close of evidence if based on a ground not previously known. Tenn. R. Crim. P. 14(a)(1)(A).

money with his tax check." The appellant was supposed to be introduced to the informant's "friend" during the first transaction, but the appellant did not enter the apartment to do so.

During the marijuana transaction, the informant and appellant further discussed the sale of "flake," which is slang for cocaine, to the informant's friend. The informant once again told appellant that his friend wanted to purchase some flake as soon as his "old lady" "turn[ed] loose some more money." Appellant replied, "Okay. No problem." They did not set a date for the cocaine purchase at the time of the marijuana purchase. The confidential informant followed up the discussion about his friend wanting to purchase cocaine from appellant with telephone calls to appellant. After a few telephone conversations on February 23, 2009, appellant and the informant arranged the cocaine purchase for later that day. We conclude that appellant and the informant's conversations before and during the marijuana transaction about the later purchase of cocaine and the subsequent telephone calls regarding the purchase of cocaine support the trial court's conclusion that there was a continuing scheme or plan.

Tennessee Rule of Evidence 404, which governs the admissibility of prior misconduct, guides the second factor: whether evidence of one offense would be admissible in the trial of the others. Under this rule, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). It may, however, be admissible for other purposes such as proving identity or intent, to rebut accident or mistake, or to show a common scheme or plan for commission of two or more crimes. *See* Tenn. R. Evid. 404 Advisory Comm'n Cmts. The trial court determined that the evidence of one offense would be admissible in the trial of the other because motive, intent, and absence of mistake were issues in appellant's case. The trial court further instructed the State that "any other bad acts, wrongs, [or] anything else cannot be brought up during the course of the trial." We agree with the trial court's determinations. Evidence of appellant and informant's January 22nd discussions before and during the marijuana transaction regarding the purchase of "flake" would be admissible in the trial on the cocaine offense to show criminal intent or motive to sell drugs, lack of any accident or mistake, and guilty knowledge.

Finally, regarding the third factor that "the probative value of the evidence of the other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant," *Dotson*, 254 S.W.3d at 387 (citing *Spicer*, 12 S.W.3d at 445), the trial court ruled that the prejudicial effect of the other offense did not outweigh its probative value. In so finding, the trial court noted that the offenses were part of a common scheme to sell marijuana or cocaine, and they would be admissible in the trials of each other. The court further found that the offense was "not so prejudicial as to inflame the jury, [and] it assist[ed] in the finding of intent, motive, and absence of mistake of fact." We agree with

the trial court. "Unfair prejudice" is "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). The evidence of the conversations before and during the marijuana transaction regarding the purchase of cocaine were "highly relevant to material issues, . . . did not introduce any extraneous issues[,] and . . . did not cause the jury to decide the case on an improper basis." *State v. DuBose*, 953 S.W.2d 649, 655 (Tenn. 1997). We conclude that the probative value of the evidence of the other offenses is not outweighed by any danger of unfair prejudice that admission of the evidence might have on the substantive issues.

We cannot say that the trial court applied the incorrect legal standard or that it reached an illogical or unreasonable conclusion that caused injustice. We have also conducted our own independent analysis of the evidence produced at trial. The evidence shows that appellant and the informant had a continuing plan for appellant to sell cocaine to the informant or the informant's friend. Further the evidence of one of the offenses is relevant in the trial of the other on the issues of motive, intent, absence of mistake of fact; and common scheme or plan. Finally, the probative value of the evidence of the other offense is not outweighed by the prejudicial effect that admission of the evidence would have on the appellant. Accordingly, we conclude that the trial court did not abuse its discretion in denying appellant's second motion to sever.

*B. Sentencing Range*

Next, appellant argues that the trial court erred in sentencing him as a persistent offender because the notice of intent to seek enhanced punishment indicated that the State would prove that appellant was a career offender, but it only listed enough convictions to establish him as a multiple offender. In the alternative, appellant argues that he is entitled to re-sentencing because he did not receive adequate notice regarding the enhancement of his sentence, which denied him due process.

When an accused challenges the length and manner of service of a sentence, this court conducts a de novo review on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn Code Ann. § 40-35-401(d) (2006). We condition this presumption upon "the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). We do not apply the presumption to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court predicated upon uncontroverted facts. *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App.

1994); *State v. Bonestel*, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9 (Tenn. 2000).

Tennessee Code Annotated section 40-35-202(a) governs the notice requirements for enhancement factors.

> If the district attorney general believes that a defendant should be sentenced as a multiple, persistent or career offender, the district attorney general shall file a statement thereof with the court and defense counsel not less than ten (10) days before trial or acceptance of a guilty plea; provided, that notice may be waived by the defendant in writing with the consent of the district attorney general and the court accepting the plea. The statement, which shall not be made known to the jury determining the guilt or innocence of the defendant on the primary offense, must set forth the nature of the prior felony convictions, the dates of the convictions and the identity of the courts of the convictions.

Tenn. Code Ann. § 40-35-202(a) (2006). This notice provision requires that the State at least file a: "(1) written notice, (2) clearly expressing the State's intention to seek sentencing outside of the standard offender range, [and] (3) setting forth the nature of the prior felony conviction, the dates of the convictions, and the identity of the courts of the convictions." *State v. Livingston*, 197 S.W.3d 710, 713-14 (Tenn. 2006) (footnote omitted). "The purpose of subsection (a) is to provide fair notice to an accused that he is exposed to other than standard sentencing." *State v. Adams*, 788 S.W.2d 557, 559 (Tenn. 1990).

On September 3, 2009, the State filed a notice of intent to seek enhanced punishment, pursuant to Tennessee Code Annotated section 40-35-202(a). The State filed the notice more than a year before the trial, well before the ten-day requirement contained in the statute. *See* Tenn. Code Ann. § 40-35-202(a) (2006). The State listed six[3] prior felony convictions in the notice of intent to seek enhanced punishment. Three of the prior convictions occurred on the same date, consequently, the notice contained four prior convictions that the court could use to establish appellant's sentencing range. *See* Tenn. Code Ann. § 40-35-108(b)(4) (2006) (Excluding specified exceptions, "convictions for multiple felonies committed within the same twenty-four-hour period constitute one (1) conviction for the purpose of determining prior convictions."). The notice to seek enhancement also stated that, if found guilty, the court should sentence appellant as a career offender. As applicable to appellant's two convictions, a career offender is a defendant who has "[a]ny combination of six (6) or more

_____

[3] The State's notice of intent to seek enhanced punishment initially listed seven prior convictions. Appellant's 1996 conviction in case number 96-9759 had a line drawn through it and was not used.

Class A, B or C prior felony convictions, and the defendant's conviction offense is a . . . C felony" or a defendant who has "[a]t least six (6) prior felony convictions of any classification if the defendant's conviction offense is a Class D . . . felony. Tenn. Code Ann. § 40-35-108(a)(1) (2006).

At the sentencing hearing, the State introduced certified copies of appellant's prior convictions, including a prior conviction that the State did not include on the notice of intent to seek an enhanced sentence. In making its ruling, the trial court noted that "it's very difficult to get a proper record of a [d]efendant after a jury trial, but [appellant] was also given notice that he's a Career Offender." The trial court concluded that appellant was not prejudiced by the State's failure to include the fifth conviction on the notice to seek enhanced punishment. The court considered the five prior convictions and found that appellant was a persistent offender. *See Id.* § 40-35-107(a)(1) ("A persistent offender is a defendant who has received . . . five (5) or more prior felony convictions within the conviction class or higher or within the next two (2) lower felony classes.").

Relying on this court's decision in *State v. Melvin Shorty*, No. W2009-02284-CCA-R3-CD, 2010 WL 5313268, at *1 (Tenn. Crim. App. Dec. 20, 2010), appellant argues that the State did not substantially comply with the notice requirement because it did not give notice of the fifth conviction for purposes of establishing appellant's range at least ten days before trial. In *Shorty*, the State filed a notice of intent to seek enhanced punishment that stated that the court should sentence Shorty as a multiple, persistent, or career offender based on two prior Tennessee convictions that occurred on the same day. *Id.* The day before the sentencing hearing, the State filed a "Motion for Consideration of Enhancement Factors at Sentencing" that sought enhancement of Shorty's sentence based on the convictions listed in the notice to seek enhanced punishment and two Wisconsin felony convictions. *Id.* The court in *Shorty* held that the State's notice "did not substantially comply with the requirements of section 40-35-202(a) because (1) it failed to specify a particular range of punishment[,] and (2) it did not identify the felonies upon which the State intended to rely for enhanced punishment." *Id.* at *5.

Appellant's case is distinguishable from *Shorty* because unlike the notice in *Shorty*, which failed to specify the range and identify the predicate felonies, the notice of intent to seek an enhanced sentence in this case specified a range of punishment and identified all but one felony upon which the State intended to rely to enhance appellant's sentence. Thus, we conclude that this appellant's case is more analogous to this court's decision in *State v. James Tyrone Harbison*, No. 03C01-9808-CR-00271, 1999 WL 804056, at *6 (Tenn. Crim. App. Oct. 6, 1999).

In *James Tyrone Harbison,* the trial court sentenced the defendant as a Range III, persistent offender. *Id.* The notice of enhancement contained five prior convictions, two of which the court treated as one because they occurred on the same date. *Id.* The State, with no objection from the defendant, presented evidence of seven prior convictions. The defendant appealed, arguing that the notice of enhancement was insufficient to support the trial court's sentencing him as a persistent offender because it only listed four prior convictions. *Id.* Noting our supreme court's holding in *Adams* that if "the [S]tate substantially complies with Tennessee Code Annotated § 40-35-202(a), then the defendant has a duty to inquire about an incomplete notice and, absent the inquiry, must show prejudice to obtain relief based on that notice," this court affirmed the defendant's sentence. *Id.* (citing *Adams*, 788 S.W.2d at 559).

Considering the aforementioned cases, we conclude that the State substantially complied with the notice requirements of Tennessee Code Annotated section 40-35-202(a). The notice filed in this case listed four felonies that could support an enhanced sentence and specified that the State sought the court to sentence appellant as a career offender, which was a greater range than the range in which the court actually sentenced appellant. Thus, to obtain relief, appellant had to inquire about the incomplete notice and show that the incomplete notice prejudiced him. *See Adams*, 788 S.W.2d at 559.

Although the notice of intent to seek enhanced punishment only listed four prior convictions, which would make appellant a multiple offender, it also gave appellant notice that the State intended to establish that he was a career offender. The notice filed by the State gave "fair notice to accused that he is exposed to other than standard sentencing." *Id.* Furthermore, appellant was not misled or surprised by the State's seeking enhanced punishment. Thus, the notice accomplished the purpose of the statute. *See State v. Chase*, 873 S.W.2d 7, 9 (Tenn. Crim. App. 1993). "We may assume that [appellant] was aware of his own extensive criminal history prior to trial and note that he has failed to show any prejudice arising from a lack of knowledge about which particular range the State was contemplating to seek for purposes of sentencing." *State v. Taylor*, 63 S.W.3d 400, 413 (Tenn. Crim. App. 2001). Appellant had fair notice that the State intended to establish that he was a career offender. The notice only listed enough convictions to establish that he was a multiple offender, yet appellant did not inquire about the incomplete notice. Furthermore, "[t]he fact that the appellant was sentenced within the proper range, based upon his prior convictions, does not establish prejudice." *State v. Gilmore*, 823 S.W.2d 566, 571 (Tenn. Crim. App. 1991). Based on his prior convictions, the trial court sentenced appellant within the appropriate range, which was actually a lesser range than that listed on the notice of intent to seek enhanced punishment. Accordingly, we conclude that the trial court did not err in sentencing appellant as a persistent offender. Appellant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE