# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 22, 2012 Session

## CRAIG U. QUEVEDO v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Montgomery County**
**No. 4000492      Michael R. Jones, Judge**

---

**No. M2010-01399-CCA-R3-PC - Filed March 22, 2013**

---

The Petitioner, Craig U. Quevedo, appeals as of right from the Montgomery County Circuit Court's denial of his petition for post-conviction relief. In 2002, the Petitioner pled guilty to numerous counts of rape and incest, and pled nolo contendere to multiple counts of rape, rape of a child, and aggravated sexual battery, as well as one count of aggravated rape. See Tenn. Code Ann. §§ 39-13-502(a)(2), -13-503(a)(1), -13-504(a)(4), -13-522(a), -15-302(a)(1). Following a sentencing hearing, the Petitioner received an effective sentence of ninety-two years. On appeal, the Petitioner contends (1) that he received ineffective assistance of counsel because his trial counsel failed to file a motion to suppress a journal written by the Petitioner prior to the entry of his pleas; (2) that trial counsel was also ineffective in failing to file a motion to sever certain offenses prior to the entry of his pleas; and (3) that he received ineffective assistance of counsel at his sentencing hearing because trial counsel failed to object to the admission of his journal into evidence and failed to present sufficient mitigating evidence. Following our review, we affirm the judgment of the post-conviction court with respect to the Petitioner's first two issues. However, the post-conviction court failed to make any findings of fact or conclusions of law with respect to the Petitioner's issues regarding his sentencing hearing. As such, the case is remanded for the post-conviction court to enter an order stating its findings of fact and conclusions of law with respect to the sentencing hearing issues.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JEFFREY S. BIVINS, JJ., joined.

John E. Herbison, Nashville, Tennessee, for the appellant, Craig U. Quevedo.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon and Lindsy Paduch Stempel, Assistant Attorneys General; John Wesley Carney, Jr., District Attorney General; and Arthur F. Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

*I. Evidence Underlying Petitioner's Pleas and Sentences*

The factual basis underlying the Petitioner's pleas in this case was extremely graphic and particularly disturbing. In August 2000, the Petitioner was indicted "on seventy-nine counts of various child rape, rape, aggravated rape, incest and sexual battery crimes" involving his adopted step-daughter. State v. Craig U. Quevedo, No. M2002-02468-CCA-R3-CD, 2004 WL 193072, at *1 (Tenn. Crim. App. Jan. 27, 2004), perm. app. denied, (Tenn. June 21, 2004). In August 2002, the Petitioner pled guilty to thirty counts of rape and twenty-four counts of incest. The Petitioner also pled nolo contendere to nine counts of rape, four counts of rape of a child, two counts of aggravated sexual battery, and one count of aggravated rape. The Petitioner agreed to plead "open" and have his sentences determined by the trial court. Following a sentencing hearing in October 2002, the Petitioner received an effective sentence of ninety-two years. The Petitioner's sentences were affirmed by this court on direct appeal, and our supreme court declined to review that decision. Id.

*A. Contents of the Petitioner's Journal*

To provide a factual basis for the Petitioner's pleas, the State introduced into evidence a thirty-three page journal,[1] which the State proffered had been found "encrypted" on the Petitioner's "work computer," and read into the record extensive excerpts from the journal to correspond with each plea. The first entry in the journal was dated January 1, 1996. In that entry, the Petitioner described his relationship with the victim as being "intimate" and stated that he had "kissed [] and touched every part of her body," that he had touched her

---

[1]The State repeatedly referred to the journal as "the Doogie Howser journal." The first entry in the journal stated that the Petitioner was "inspired" to start the journal by the television program Doogie Howser, M.D. Doogie Howser, M.D. was a situation comedy that aired during the early 1990s and starred Neil Patrick Harris as a child prodigy who was a sixteen-year-old doctor. See Tim Brooks & Earle Marsh, The Complete Directory to Prime Time Network and Cable TV Shows 327-28 (8th ed. 2003). Each episode would end with the main character making an entry into a journal kept on his personal computer. Id. The Petitioner testified that he decided to keep a journal on his work computer as a good way to deal "with the issues that had started," namely his sexual molestation and repeated raping of the victim.

breasts and vagina, and that he had "gone down on her." The Petitioner then complained that the victim did not seem to be as in love with him as he was with her and stated that he might be "expecting too much of a twelve year old [sic]." The Petitioner also described the victim's hymen and stated that he wanted "to be the one who breaks that [hymen]."

The second entry in the journal was dated January 2, 1996. In that entry, the Petitioner stated that he was going to "relate important events . . . from 1995." The Petitioner stated that he "first noticed that [he] had very strong feelings" for the victim in October 1995. The Petitioner then stated that on October 28, 1995, he watched the victim shower and that on October 30, 1995, he touched the victim's breasts. The next entry in the journal was dated January 9, 1996. The entry began with the Petitioner stating that before he "start[ed] where [he] left off on the significant events of 1995" he was going to describe what he had done to the victim in the previous week. The Petitioner stated that the previous morning he had performed cunnilingus on the victim and that, later that day, he had rubbed her breasts and vagina. The Petitioner then stated that he wanted to "recount some more things that have happened before." The Petitioner stated that on November 12, 1995, he digitally penetrated the victim's vagina for the first time; that on December 17, 1995, he performed cunnilingus on the victim for the first time; and that on December 22, 1995, he penetrated the victim's vagina with his penis.

The remainder of the journal contained numerous entries dating from January 10, 1996 to April 12, 2000. Throughout the majority of the remaining journal entries, the Petitioner discussed his repeated attempts to convince the victim to allow him "to achieve full penetration" with her. The journal contained repeated descriptions of the victim's hymen and how far the Petitioner was able to penetrate into the victim's vagina. The journal also contained repeated descriptions of the Petitioner's attempts to "stretch" the victim's hymen using his fingers, penis, chemical agents, and other methods. In a journal entry dated December 16, 1996, the Petitioner stated that he planned to acquire some GHB[2] in order to drug the victim and "get anything [he] want[ed]," including the opportunity to "go all the way and really f--k her." The Petitioner later stated in the journal that on February 17, 1997, he drugged the victim with GHB, penetrated her vagina with a pair of scissors, and "manage[d] to cut her hymen so that the hole [was] big enough to let a penis into her vagina."

The Petitioner repeatedly stated in the journal that he needed to find a way to "convince [the victim] to let [him] take her virginity" because he believed that would cause the victim to "enjoy" sex with him. The Petitioner believed that then the victim would agree to engage in more sexual activity with him. On several different occasions, the Petitioner attempted to calculate in the journal the number of times he could rape the victim before she

---

[2]Gamma Hydroxybutyrate, commonly known as the "date rape" drug.

turned eighteen and expressed his desire to rape her several hundred times more. The Petitioner also repeatedly discussed his desire to one day marry the victim, that marrying the victim was his "number one goal," and that he wanted to be "the only one she ever" had sex with. After years of raping and sexually molesting the victim, the Petitioner recorded in the journal on February 2, 1999, that he "broke [the victim's] hymen," that he was achieving "full penetration," and that he "was her first everything." After this, the Petitioner continued to express his desire to marry the victim and continued to calculate the number of times he could rape the victim before she turned eighteen. On July 20, 1999, the Petitioner stated that he was attempting to convince the victim "to live at home when she goes to college" so that he could "continue to f--k her for the entire time that she [was] in college."

The journal concluded in 2000, shortly before the Petitioner's arrest, when the Petitioner learned that the victim had begun a sexual relationship with her high school boyfriend. In the final journal entries, the Petitioner chronicled how he listened in on the victim and her boyfriend's phone conversations, taped their phone conversations, and intercepted and read their emails to each other in order to find out information about their relationship. The Petitioner described the victim's boyfriend as "the most disgusting and perverted person [in] the world." The Petitioner repeatedly stated that he wanted to kill the victim's boyfriend and, at one point, stated that he "would probably enjoy" taking a gun and "blow[ing] his f--king head off." The Petitioner continued, stating that he wanted to take the victim's boyfriend's "penis and shred it and smash it and burn it to make sure that it [was] completely and utterly destroyed" because it "had been somewhere that it should never have been and [he] want[ed] it destroyed."

In addition to the dates associated with each journal entry, several entries contained contextual information relating to when they were written. For example, the entry dated May 15, 1996, discussed the fact that the victim would soon be on summer vacation from school. Likewise, entries on August 6, 1996 and August 14, 1996, referred to the fact that the victim would soon be back in school. Some entries, such as the entry for July 31, 1996, referred to the date in the body of the text, stating that it was "[t]he last day of July." The entry for October 28, 1996, stated that it had been "one year" since the Petitioner "peeked in on [the victim] while she was taking a shower" and that "[w]ho would have thought that one year later [they] would be where" they were. Whenever there were significant periods of time between entries, the Petitioner would make statements such as "[a] lot has happened since my last entry in this journal," "[i]t has been awhile since I wrote in this journal," or "I haven't made an entry in this journal in a very long time." On April 25, 1996, the Petitioner stated that he showed the journal to the victim.

*B. The Petitioner's Guilty Plea Submission Hearing*

At the Petitioner's plea submission hearing, the Petitioner stated to the trial court that he understood what he was accused of, the possible range of punishments that he faced for each offense, and what offenses he was pleading guilty or nolo contendere to. The trial court explained the Petitioner's constitutional rights to him and, the Petitioner affirmed that he understood his rights and was waiving them in order to plead guilty and nolo contendere. The trial court explained to the Petitioner the difference between a guilty plea and a nolo contendere plea and that "the end result" of a nolo contendere plea would be "a finding of [guilty]." The Petitioner responded that he understood the difference between the two pleas. The Petitioner stated that no one had forced him to enter his pleas and that he had "sufficient time to discuss all of this" with trial counsel. The trial court repeatedly asked the Petitioner if he had any questions, and the Petitioner responded each time that he did not.

The trial court then explained to the Petitioner that he was pleading "open" with no sentencing agreement and that the trial court would later hold a sentencing hearing to decide the Petitioner's sentence. The trial court also explained the factors it would consider in determining the length of the Petitioner's sentences. The trial court further explained that the Petitioner could face consecutive sentences pursuant to Tennessee Code Annotated section 40-35-115(b)(5) and explained to the Petitioner what factors it would consider in making a determination on consecutive sentencing. The Petitioner stated to the trial court that he understood all of this. The plea submission hearing concluded with the Petitioner's admitting that the journal entries read by the State to provide a factual basis for the Petitioner's guilty pleas were true. With respect to his pleas of nolo contendere, the Petitioner admitted that the State had sufficient evidence to present to a jury and obtain guilty verdicts.

*C. The Petitioner's Sentencing Hearing*

At the Petitioner's sentencing hearing, "the State introduced the pre-sentence report, victim impact statements from the victim and other family members, and the [Petitioner's] journal." Quevedo, 2004 WL 193072, at *1. The pre-sentence report showed that the Petitioner had graduated from high school, that he had no prior criminal record, that he had been honorably discharged after seven years in the United States Air Force, and that he had worked for over twelve years for a defense contractor and was skilled in computer programing. During the sentencing hearing, trial counsel stated that the Petitioner had "a good work history" and that he had worked "in what must have been a highly sensitive area" and "was obviously trusted in that regard." In the pre-sentence report, the Petitioner stated that the circumstances of his offenses were "not that important" because of his pleas and that the Petitioner believed that he had done "the right thing" and accepted "full responsibility for

[his] actions." The Petitioner also stated in the pre-sentence report that he had a "difficult" childhood and that he had witnessed his father sexually abuse one of his sisters.

In her victim's impact statement, the victim stated that the Petitioner had "used his role of authority to control [her]" and that he had stolen her youth and innocence. Quevedo, 2004 WL 193072, at *1. According to the victim, the Petitioner would "make it a point" to take out his frustrations on the rest of her family if she refused to satisfy his sexual desires. The victim explained that it was easier to give in to the Petitioner for "a few, brief, awful moments a day" so that "the rest of the day would be peaceful for everyone." The victim stated that she lived in constant fear of the Petitioner and that no one deserved "the torture [she] was subjected to." The victim described the Petitioner as having an "incurable disease" and that the Petitioner would go "to great lengths to make sure that he" got what he wanted. Id. The victim's mother stated in her victim's impact statement that the Petitioner had fled the state after his abuse of the victim had been revealed and that the Petitioner had drained the family's bank accounts before he fled.

The Petitioner called the victim to testify at his sentencing hearing. The victim reiterated many of the things she had stated in her victim's impact statement. The victim testified that she was now married and had a child with her high school boyfriend, who the Petitioner had repeatedly threatened to kill in his journal. The victim further testified that she had frequent nightmares of the Petitioner's abusing her and that she had sought professional counseling to help her recover from the Petitioner's abuse. One of the Petitioner's sisters also testified at the sentencing hearing. She testified that the Petitioner's actions were completely "out of character" and that the Petitioner was "a very intelligent, very nice man." The Petitioner's sister testified that their older sister had been molested by their father as a child, but she denied that this somehow caused the Petitioner to rape and molest the victim over a period of several years.

The Petitioner addressed the trial court and apologized for "dragging this out as long as it" had. The Petitioner stated that he "had to make a very difficult choice" about whether to take his case to trial. The Petitioner stated that he pled guilty and nolo contendere "to save [the victim] any further grief" and so she would not have to testify at a trial. The Petitioner stated that he had "made a mistake," but that it "was not [his] intention to harm anyone." The Petitioner insisted that his actions were not "premeditated" and that, despite sexually abusing the victim for several years, it just "happened." The Petitioner stated that he was sorry that he hurt so many people and that he "caused [himself] a great deal of grief." The Petitioner stated that he hoped that the victim and his family would one day forgive him and that he had "a lot of difficulty" with his guilt. The Petitioner also stated that he hoped the trial court could see "some measure of character and integrity [in him] that [did not] appear before [the

trial court] very often" and that the trial court would give him the opportunity to "be free again" one day.

## II. Post-Conviction Proceedings

The Petitioner, with the assistance of counsel, filed a timely petition for post-conviction relief and subsequent amended petition. In his original petition, the Petitioner claimed that he received ineffective assistance from his trial counsel because trial counsel failed to file a motion to sever the offenses and failed to file a motion to suppress the journal. The Petitioner argued that his guilty and nolo contendere pleas were not knowingly and voluntarily entered into because of trial counsel's actions with respect to those issues. The Petitioner also argued that he received ineffective assistance from trial counsel because trial counsel failed to present to the trial court various mitigating factors "which were referenced in the pre-sentence report." However, the Petitioner later admitted in his petition that "additional mitigating factors [] could be adduced from the pre-sentence report." In his amended petition, the Petitioner argued that trial counsel failed to advise him prior to his pleas of what factors the trial court would consider in determining whether to impose consecutive sentencing pursuant to Tennessee Code Annotated section 40-35-115(b)(5). The Petitioner also raised several other factual allegations of ineffective assistance of counsel in his amended petition. On March 29, 2010, the post-conviction court held a hearing on the Petitioner's claims.

## A. The Petitioner's Testimony

At the hearing, the Petitioner admitted that he had "sexual contact" with the victim including "inappropriate touching," "sexual intimacy," and "sexual penetration." The Petitioner denied that he was sexually attracted to children and testified that he was only attracted to the victim because she bore "a very, very strong resemblance to her mother," the Petitioner's ex-wife. The Petitioner explained that he and the victim's mother had met when they were teenagers and that he "had fallen crazy mad over" the victim's mother, but she eventually "broke [his] heart when she went off and married somebody else." Despite eventually marrying the victim's mother, the Petitioner testified that he "was trying to recapture a lost youth" by repeatedly raping and sexually molesting the victim and that he hoped to eventually marry and have children with the victim because she looked like her mother "reincarnated." The Petitioner claimed that he sexually abused the victim for over four years because he was suffering from "emotional insanity . . . brought on by [the victim's] resemblance [to] her mother." The Petitioner testified that he never told trial counsel about the reasons for his attraction to the victim because trial counsel "never asked [him] why."

The Petitioner claimed that his sexual abuse of the victim began due to the victim's "curiosity" and that she "often questioned [him] at length about sex." However, the Petitioner denied that he had any "improper sexual contact" with the victim prior to her thirteenth birthday. The Petitioner testified that he began sexually abusing the victim sometime around May 1996. According to the Petitioner, he pled nolo contendere to all of the counts involving offenses dated before May 1996 because "nothing happened prior to May" and he refused to admit guilt on those charges. The Petitioner explained that had he not been allowed to plead nolo contendere to those charges, he would have insisted on taking "the entire matter to a jury trial" because "there was no sexual contact prior to [the victim's] [thirteenth] birthday" and he refused to plead guilty "to something that [he] did not do." According to the Petitioner, he strongly wanted to exercise his right to testify with respect to the offenses alleged to have occurred before May 1996, but he also wanted to assert his right not to testify as to the remaining counts. The Petitioner testified that he wrote to trial counsel and "had discussions" with him about filing a motion to sever, but that trial counsel told the Petitioner that he did not believe a severance motion would be granted. However, the Petitioner later claimed that trial counsel never spoke to him about the possibility of filing a motion to sever.

The Petitioner admitted that he authored the journal that the State introduced into evidence at his plea submission and sentencing hearings. The Petitioner also admitted that he had written in the journal in "pretty explicit detail" about his sexual abuse of the victim. The Petitioner testified that he started the journal as a way to "express [himself] and deal with . . . the situation that [he] was in." The Petitioner claimed that he started the journal on his work computer sometime in "June or July" of 1996. The Petitioner also claimed that his journal was password protected and that he never gave anyone the password to his journal. According to the Petitioner, he informed trial counsel that the journal "wasn't accurate," that the dates of the journal entries were "off by at least six months," and that the journal introduced into evidence showed that the Petitioner had made entries prior to June or July 1996. The Petitioner explained that he never dated the entries himself, but instead, he had the journal programmed to enter the date when he "hit the space bar three times." The Petitioner further explained that he knew the correct date had been placed into the journal entries because the program "was hooked" into his work server "and it had the accurate date." The Petitioner also testified that he alerted trial counsel to the fact that there "were some significant gaps" in the journal. The Petitioner claimed that he was "very, very religious about" writing in his journal, that he wrote in the journal three or four times a week, and that he "[v]ery rarely" went more than four days without writing in the journal.

According to the Petitioner, he repeatedly "expressed concern" over the journal to trial counsel, telling him "obviously this file's been altered." The Petitioner claimed that his employer's "computing system" was "very insecure." The Petitioner opined that "with very

-8-

little effort" someone "with any rudimentary knowledge" of the computer program the journal was created in "could go in there with a query [and] change information in it rather easily." The Petitioner claimed that his employer "had failed two or three security reviews" and that he was aware of this due to his position as the network administrator. The Petitioner also claimed that anyone could walk into the building he worked in and "sit down at [a] computer and access our network." The Petitioner testified that he expressed concerns about the security of the computer system to his supervisors, but his concerns were ignored. The Petitioner admitted that part of the reason for his concern was that he had "incriminating information" on his employer's computer system. The Petitioner admitted that he knew of no one who had accessed his journal, but he claimed that "anyone that had [his] user name and password could access [the journal] from any connected workstation." The Petitioner claimed that his password was "not very" difficult to figure out and that he had not changed his password "in over three years."

After testifying in extensive detail about the perceived flaws in his employer's computer system security, the Petitioner testified that he had addressed these issues with trial counsel. According to the Petitioner, he spoke with trial counsel about the journal and his employer's computer system at least "ten times." The Petitioner claimed that he repeatedly asked trial counsel to file a motion to suppress the journal but that trial counsel told him that "such a motion would be a waste of time" because his employer had given the State his journal on a "silver platter." The Petitioner also claimed that he insisted that trial counsel file a motion to suppress so he could testify at a suppression hearing about his belief that the journal "had been tampered with." According to the Petitioner, trial counsel ignored his insistence and failed to file a motion to suppress without giving him any explanation other than the fact that trial counsel thought it was "a waste of time." The Petitioner testified that he was "[e]xtreme[ly] concern[ed]" by the fact that no witnesses were called to authenticate his journal at the plea submission and sentencing hearings but that trial counsel ignored his concerns.

The Petitioner testified that he only pled guilty and nolo contendere because trial counsel told him "that was [his] only chance" to avoid "spending the rest of [his] life in prison." According to the Petitioner, on the day his trial was scheduled to begin, trial counsel had "basically conceded [they] would not win at trial." The Petitioner testified that he felt panicked when trial counsel told him this. The Petitioner claimed that he did not want to leave his sentence up to the trial court, but that he was out of options. The Petitioner further stated that trial counsel told him that the trial court "may be lenient" if he pled and avoided taking up the trial court's time. The Petitioner further claimed that he did not understand his pleas and the possible sentencing consequences. According to the Petitioner, trial counsel never explained to him the difference between a guilty plea and a nolo contendere plea. The Petitioner further testified that he did not "understand the sentencing implications" of his

pleas. The Petitioner claimed that trial counsel informed him that some of his sentences could have "run consecutive" but that trial counsel did not explain how the trial court would make that decision. The Petitioner testified that no one had ever discussed with him the factors in Tennessee Code Annotated section 40-35-115(b)(5) and that he did not know about section 40-35-115(b)(5) until he read this court's opinion in his direct appeal.

The Petitioner also complained that trial counsel failed to introduce significant mitigating evidence at his sentencing hearing. According to the Petitioner, trial counsel failed to establish that he was "a person of fairly solid character." The Petitioner stated that he was a good candidate for rehabilitation because he believed "in the pursuit of excellence in all things." The Petitioner testified that he had "worked hard to provide for [his] family" and that his family "suffered for nothing." The Petitioner told the post-conviction court that he had "tried to set a positive example for" his children and "provided for them emotionally." The Petitioner stated that he had been actively involved in various charitable activities since he was a teenager, and that since being incarcerated, he would read and write letters for fellow inmates who were illiterate. The Petitioner testified that other inmates trusted him because they could tell that he was an "intelligent person" and a "caring individual." According to the Petitioner, trial counsel should have presented evidence of his community involvement at his sentencing hearing in order to show that the Petitioner had "a caring nature and compassion for [his] fellow man." The Petitioner also complained that evidence regarding his attraction to the victim should have been presented to the trial court in order to show that his crimes were "a unique instance" that were "impossible to be repeated."

The Petitioner testified extensively about his service in the United States Air Force and claimed to have received a top secret security clearance, as well as having been "exposed to classified information concerning nuclear weapons." According to the Petitioner, he served in the Air Force from 1979 until 1986. The Petitioner testified that he was "administratively separated" for being overweight but claimed that he was actually forced to retire from the Air Force due to a conflict between his unit and a base commander. The Petitioner stated that the trial court should have been made aware of the details of his military service because he had "served [his] country with honor and distinction" by "performing a mission that not many people can do, providing security and safety for everybody in this country." The Petitioner testified that after his discharge from the Air Force, he worked for various defense contractors and eventually became a network administrator. The Petitioner argued that evidence regarding his employment history should have been presented to the trial court because it showed that he was "a person of responsible character," that he had "worked in the capacity of professionalism that not many can achieve," and that he "was a superior performer in every aspect of [his] job."

On cross-examination, the Petitioner admitted that his attraction to the victim "was sexual" and not based solely on his desire to "recapture a lost youth." The Petitioner denied that, due to his role as network administrator, none of his co-workers had access to his computer account. The Petitioner also denied that trial counsel had informed him that one of his co-workers had found the password for his computer or that another co-worker had "imaged" his employer's "hard drive and pulled up" portions of the journal. The Petitioner further denied that trial counsel informed him that the journal had been examined by an expert hired by his employer and that the expert had concluded that the journal had not been tampered with. The Petitioner testified that he was unaware about his employer's investigation into the journal and that none of that information played a role in his decision to plead guilty or nolo contendere to the majority of his charges. The Petitioner maintained during cross-examination that the victim was thirteen when he began molesting and raping her.

*B. Trial Counsel's Testimony*

Trial counsel testified at the post-conviction hearing that he had been practicing law for twenty-one years and that ninety-five percent of his practice was criminal defense work. Trial counsel testified that he began representing the Petitioner approximately halfway through the pretrial process. Trial counsel spoke with the Petitioner and thought that the Petitioner was intelligent and forthcoming. Trial counsel recalled that the Petitioner "was reluctant to enter pleas." Trial counsel testified that he advised the Petitioner to enter "open pleas" because he believed that if the Petitioner accepted "responsibility for his conduct" and saved "the State from the trouble of having to try the case," then the trial court might give him a lesser sentence than if the Petitioner had gone to trial. Trial counsel testified that he could not recall what, if any, pretrial motions he filed on the Petitioner's behalf. Trial counsel also could not recall if he explained Tennessee Code Annotated section 40-35-115(b)(5) to the Petitioner.

According to trial counsel, he had several conversations with the Petitioner about the journal. Trial counsel recalled that the Petitioner told him that the journal was on a computer at the Petitioner's workplace and that only the Petitioner "had access to that part of the computer." Trial counsel also recalled that the Petitioner suggested to him "that some of his co-workers might have got into the computer and could have changed the contents" of the journal. However, trial counsel could not recall if the Petitioner had discussed with him "any security deficiencies" in the computer system or expressed any concern over the dates in the journal. Trial counsel did recall that two of the Petitioner's co-workers had "recovered and imaged" the journal from the hard drive of the Petitioner's work computer. Trial counsel testified that he did not file a motion to suppress the journal because he believed that the Petitioner's concerns that the document had been altered "would have gone to [the] weight

[of the journal] and not [its] admissibility." Trial counsel recalled that he expected the State to call the two co-workers who had accessed the Petitioner's "part of the computer and discovered" the journal. Trial counsel testified that, ultimately, he did not file a motion to suppress because he "could not conceive of a legal theory to keep [the journal] out."

Trial counsel could not recall if the Petitioner had denied "any sexual conduct occurring before" the victim turned thirteen. Trial counsel also could not recall why the Petitioner pled guilty to some counts and nolo contendere to other counts. Trial counsel testified that he never considered filing a severance motion because he "didn't think [he] could win the motion." Trial counsel explained that he believed that the offenses were "all part of [a] common scheme or plan" and that because the journal covered "all of the conduct," evidence of one offense "would be admissible on the other counts." Based upon that, trial counsel concluded that he could not "get a severance from the [trial court]." Trial counsel also testified that he "didn't see any advantage to . . . severing the offenses."

*C. Post-Conviction Court's Order*

On May 24, 2010, the post-conviction court entered a written order denying post-conviction relief to the Petitioner.[3] The post-conviction court concluded that the Petitioner "did not assert or establish any ground[s] that an attorney could use to suppress the journal." The post-conviction court stated that the Petitioner's testimony that the journal had been altered "would not have resulted in the suppression of any parts of the journal" and that the Petitioner's allegation had "no merit." With respect to the Petitioner's claim that trial counsel was ineffective for failing to file a severance motion, the post-conviction court concluded that the offense constituted "a continuing scheme or plan by the Petitioner to have full penetration of the victim's vagina . . . as many times as possible." The post-conviction court also concluded that the Petitioner failed to show any prejudice caused by trial counsel's failure to file a severance motion. However, the post-conviction court's order made no findings of fact or conclusions of law with respect to the Petitioner's claims that trial counsel was ineffective at his sentencing hearing.

ANALYSIS

---

[3]The Petitioner raised several other claims of ineffective assistance of counsel in his original and amended petitions for post-conviction relief. The post-conviction court denied post-conviction relief on all of those claims. On appeal, the Petitioner raises only the issues of ineffective assistance of counsel with respect to trial counsel's failure to file a motion to suppress his journal, failure to file a severance motion, and trial counsel's performance at his sentencing hearing. The Petitioner has waived appellate review of all remaining issues by not raising them in his brief. See Tenn. R. App. P. 13(b).

The Petitioner contends that the post-conviction court erred by denying his petition for post-conviction relief. The Petitioner argues that trial counsel was ineffective for failing to file a motion to suppress his journal and that such a failure to object was "simply inexplicable." The Petitioner also argues that trial counsel was ineffective for failing to file a severance motion because the "mere existence of multiple sexual offenses involving the same victim" would not have been sufficient to defeat a severance motion. The Petitioner further argues that trial counsel was ineffective at his sentencing hearing because trial counsel failed to object to the admission of the journal and failed to present certain mitigating evidence. The State responds that the Petitioner failed to present any evidence that the journal had been altered or changed in any way, that the Petitioner's testimony that he created the journal and wrote about his sexual abuse of the victim proved the authenticity of the journal, and that the Petitioner's allegations would have gone to the weight and not the admissibility of the journal. The State further responds that the Petitioner failed "to present any proof at the post-conviction hearing to establish that but for counsel's failure to file the severance motion he would have insisted on going to trial." The State also responds that the Petitioner failed to establish that trial counsel's representation at the sentencing hearing was deficient.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). In the context of a guilty plea, like the present case, the effective assistance of

counsel is relevant only to the extent that it affects the voluntariness of the plea. Therefore, to satisfy the second prong of Strickland, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have [pled] guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); see also Walton v. State, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

*I. Motion to Suppress the Petitioner's Journal*

We begin by noting that trial counsel was correct in his assessment that the Petitioner's allegations that the journal had been altered would have gone to the weight of the evidence and not to its admissibility. The evidence at the post-conviction hearing established that there was no question as to the authenticity of the Petitioner's journal. The Petitioner admitted that he created the journal and wrote in graphic detail about his sexual abuse of the victim in the journal. It was also established that prior to the Petitioner's pleas, the State was prepared to present the testimony of two of the Petitioner's co-workers who found and copied the journal from the Petitioner's work computer. Additionally, the Petitioner stated in the journal itself that he had shown the journal to the victim, providing yet another witness who could have testified as to the journal's authenticity. The Petitioner's claims would have been, at best, an attack on the weight of the evidence and would not have supported a successful motion to suppress. See NEIL P. COHEN, SARAH Y. SHEPPEARD, & DONALD F. PAINE, TENNESSEE LAW OF EVIDENCE § 4.01[5][e] (6th ed. 2011) (stating that the trier of fact determines the weight to be given to a piece of evidence and in doing so the trier of fact "decides how convincing the evidence is in the context of the case").

Furthermore, even if trial counsel had been incorrect in his assessment of the admissibility of the journal, the Petitioner has failed to establish by clear and convincing evidence that the journal was altered in a way that would somehow make it inadmissible. In fact, the text of the journal belies the Petitioner's claims. In the first entry of the journal, the Petitioner referred to the victim as "a twelve-year-old." In the next two journal entries, the Petitioner stated that he wanted to discuss "significant events of 1995" and, in the body of the text, stated that his abuse of the victim began in October 1995 and then provided a timeline of the escalation of the abuse through the remainder of 1995. Additionally, entries dated in May and August of 1996 discussed the victim's summer vacation and her return to school, some entries referred to the date in the body of the text, and an entry in October 1996 stated that it had been one year since the Petitioner first saw the victim naked. Whenever there were significant periods of time between journal entries, the Petitioner would comment that he had not recently written in the journal. If the Petitioner's allegations were correct, then someone would have had to alter the dates of the journal entries, alter the text of the first three journal entries to provide references to the fact that the victim was twelve and the timeline of abuse in 1995, alter subsequent entries to provide the dates in the body of the text

-14-

and contextual references to their dates, and alter subsequent entries to make reference to gaps between the entries. The Petitioner has failed to present any such evidence beyond his own testimony theorizing that the journal had been tampered with. As such, we agree with the post-conviction court's conclusion that this issue is without merit.

## II. Motion to Sever Offenses

We also agree with trial counsel's assessment that a motion to sever the offenses would have ultimately proved unsuccessful. Tennessee Rule of Criminal Procedure 8(b) provides that "[t]wo or more offenses may be joined in the same indictment" if the offenses are either (1) "parts of a common scheme or plan" or (2) "of the same or similar character." However, Rule 14(b)(1) provides that if "two or more offenses are joined . . . pursuant to Rule 8(b), the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Once a defendant files a Rule 14(b)(1) severance motion, the trial court must sever the offenses unless it can

> conclude from the evidence and arguments presented at the hearing that: (1) the multiple offenses constitute parts of a common scheme or plan; (2) evidence of [one] offense is relevant to some material issue in the trial of all the other offenses; and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

State v. Garrett, 331 S.W.3d 392, 403 (Tenn. 2011) (quoting Spicer v. State, 12 S.W.3d 438, 445 (Tenn. 2000)).

As our supreme court has previously stated, "a common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." State v. Moore, 6 S.W.3d 235, 240 n.7 (Tenn. 1999). For offenses to be considered part of a continuing scheme or plan, the crimes must be directed toward a "common goal or purpose." State v. Denton, 149 S.W.3d 1, 15 (Tenn. 2004) (quoting State v. Hoyt, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995)) (quotation marks omitted). This "requires proof of 'a working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial.'" State v. Allen Prentice Blye, No. E2001-01375-CCA-R3-CD, 2002 WL 31487524, at *5 (Tenn. Crim. App. Nov. 1, 2002) (quoting Hoyt, 928 S.W.2d at 943), perm. app. denied, (Tenn. Mar. 10, 2003).

We agree with the post-conviction court's assessment that there was a continuing scheme or plan "by the Petitioner to have full penetration of the victim's vagina." The

Petitioner repeatedly detailed his desire "to achieve full penetration" and discussed in graphic detail his attempts to "stretch" the victim's hymen using his fingers, penis, chemical agents, and other methods. The Petitioner went so far as to drug the victim, penetrate her vagina with a pair of scissors, and cut into her hymen in order to "let [his] penis into her vagina." The Petitioner also repeatedly stated in the journal that he hoped to one day force the victim to marry him. Even after stating on February 2, 1999, that he had "broke [the victim's] hymen," the Petitioner continued to express his desire to marry the victim and calculated the number of times he could rape the victim before she turned eighteen. The Petitioner also began discussing finding a way to convince the victim to live at home "when she goes to college" so that he could continue to rape her. Contrary to the Petitioner's argument, the evidence established more than the "mere existence of multiple sexual offenses involving the same victim." The Petitioner's journal demonstrated not only a continuing scheme or plan to convince the victim to allow the Petitioner "to achieve full penetration," but also a continuing scheme or plan to groom the victim into a future wife for the Petitioner or, at the very least, force her to live in the Petitioner's house for as long as possible so the Petitioner could continue to rape her.

The primary issue of any severance case is whether the evidence of one offense would be admissible in the trial of the other if the two offenses remained severed. Garrett, 331 S.W.3d at 402. Put another way, a severance motion is essentially "'a question of evidentiary relevance.'" Id. (quoting Spicer, 12 S.W.3d at 445). Tennessee Rule of Evidence 404(b) excludes evidence of "other crimes, wrongs, or acts" committed by the defendant when offered only to show the defendant's propensity to commit the crime charged. This is because such evidence lacks relevance and invites the finder of fact to infer guilt from propensity. Garrett, 331 S.W.3d at 402-03. However, evidence of prior bad acts may be admissible for other purposes, such as "to show identity, guilty knowledge, intent, motive, to rebut a defense of mistake or accident, or to establish some other relevant issue." Moore, 6 S.W.3d at 239 n.5 (quoting State v. Hallock, 875 S.W.2d 285, 292 (Tenn. Crim. App. 1993)). Here, the Petitioner's primary argument was that his abuse of the victim did not begin until May 1996, and that he was not guilty of any offenses alleged to have occurred prior to that date. The journal and evidence of the later offenses would have been admissible in a trial regarding the pre-May 1996 offenses in order to rebut the Petitioner's argument and to establish the time frame for those offenses. Accordingly, we conclude that trial counsel was not ineffective for refusing to pursue a meritless severance motion and affirm the post-conviction court's denial of post-conviction relief regarding this issue.

### III. Trial Counsel's Performance at Sentencing

The post-conviction court made no mention of the Petitioner's claims regarding trial counsel's performance at his sentencing hearing in its order denying post-conviction relief.

Tennessee Code Annotated section 40-30-111(b) provides that upon "the final disposition of every petition" the post-conviction court "shall set forth in the order or a written memorandum of the case all grounds presented, and shall state the findings of fact and conclusions of law with regard to each ground." This court has previously determined that this requirement is mandatory. See State v. Swanson, 680 S.W.2d 487, 489 (Tenn. Crim. App. 1984). Because the post-conviction court made no findings of fact or conclusions of law with regarding trial counsel's performance at the Petitioner's sentencing hearing, we remand the case to the post-conviction court for it to enter an order addressing this issue.[4]

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, we affirm the judgment of the post-conviction court with respect to the Petitioner's first two issues. However, we remand this case to the post-conviction court for entry of an order stating its findings of facts and conclusions of law regarding the Petitioner's claims that trial counsel was ineffective at his sentencing hearing.

_____
D. KELLY THOMAS, JR., JUDGE

---

[4]The post-conviction court is not required to hold any additional hearings in this matter unless the post-conviction court itself deems it necessary.